UNITED STATES *v.* GUY W. CAPPS, INC.

No. 14. Argued November 15, 1954.—Decided February 7, 1955.

*Solicitor General Sobeloff* argued the cause for the United States. With him on the brief were *Assistant Attorney General Rankin, Assistant Attorney General Burger, Oscar H. Davis, Paul A. Sweeney* and *Herman Marcuse.*

*W. R. Ashburn* argued the cause and filed a brief for respondent.

MR. JUSTICE BURTON delivered the opinion of the Court.

In this case the United States District Court directed a verdict for respondent because petitioner failed to present evidence of either a breach of contract or resulting damages sufficient to sustain a verdict for petitioner. The

Court of Appeals, however, affirmed the judgment on the ground that the alleged contract was unenforceable. For the reasons hereafter stated, we agree with the District Court that the evidence was not sufficient to sustain the alleged breach of contract. Accordingly, we do not reach or pass upon the other grounds discussed by the Court of Appeals.

In 1948, the crops of Irish potatoes in the United States and Canada were among the largest on record. As a result, the United States, in § 1 (b) of the Agricultural Act of 1948, 62 Stat. 1247, 1248, obligated itself to support the sale of such potatoes at 90% of their parity price. This program was carried out through agreements of the Commodity Credit Corporation to purchase, from eligible growers or dealers in the United States, all Irish potatoes harvested before January 1, 1949, provided such potatoes could not be sold commercially at 90% of parity. As the unsupported Canadian prices were lower than the supported prices in the United States, it became profitable to import Canadian potatoes despite the tariff and freight charges. Recognizing that fact, Congress authorized investigations by the Tariff Commission, under the President's direction, which might lead to imposing quantitative limitations on imports or to increasing import fees. 62 Stat. 1248–1250, 7 U. S. C. § 624.

However, without resorting to that procedure, the United States acted through diplomatic channels. Its Acting Secretary of State and the Canadian Ambassador exchanged notes on November 23, 1948, purporting to consummate an executive agreement effective at once. For their text see Appendix, *infra*, at 305–309. Of special significance to this litigation are the undertakings made by Canada, in its note, to place its Irish potatoes under export control, to withhold export permits for the movement of table stock potatoes to the United States, and to issue export permits for the shipment of Canadian certified

seed potatoes to the United States only under specified circumstances. Those circumstances were that the shipments be limited to specified States where there was a legitimate demand for certified seed potatoes and to a short period before the normal seeding time. Permits were to be granted only to exporters having firm orders from legitimate United States users of Canadian seed potatoes, and those exporters were "to have included in any contract into which they might enter with a United States seed potato importer a clause in which the importer would give an assurance that the potatoes would not be diverted or reconsigned for table stock purposes." Appendix, *infra,* at 306. The agreement terminated June 20, 1949.

In December 1948, Guy W. Capps, Inc., a Virginia corporation, respondent herein, bought 48,544 one-hundred-pound bags of Canadian certified Irish seed potatoes from H. B. Willis, Inc., of Charlottetown, Prince Edward Island, a Canadian exporter. Before the exporter's shipment of them on the S. S. *Empire Gangway* to respondent at Jacksonville, Florida, respondent wired the exporter as follows: "Certified seed potatoes loaded on S. S. *Gangway* are for planting in Florida and Georgia." The shipment arrived at Jacksonville January 9, 1949.[1]  On

---

[1] January 10, 1949, the Acting Chief of the Potato Division, Fruit and Vegetable Branch of the United States Department of Agriculture, wired respondent:

"Have been informed ACCO [Atlantic Commission Company] representative, Jacksonville, Florida, claiming you have special permission from Department to sell Canadian seed for edible use, if no demand for seed. Please advise basis for claim. Account such disposition is contrary to the intent of U. S. Canadian agreement and to Canadian requirement regarding diversion or reconsignment."

January 11, 1949, respondent wired in reply: "Have not made such statement. Only put seed [potatoes] Jacksonville for seed purposes" and, later, on the same day:

"I realize fully the agreement with Canada, its intent and want

January 11, the potatoes were all invoiced by respondent to the Atlantic Commission Company at Jacksonville as "48,544 Sax Canada No. 1 Seed Potatoes @ $3.35 f. o. b." [2]

In January 1951, the United States filed the instant action against respondent in the United States District Court for the Eastern District of Virginia, claiming that the above circumstances constituted a contract between the exporter and respondent for the benefit of the United States. The complaint alleged further, upon information and belief, that, in January 1949, respondent, in violation of such contract, "sold the 48,544 sacks of seed potatoes for table stock purposes" to the damage of the United States in the amount of approximately $150,486, "in that for each quantity of potatoes so imported from Canada and sold for table stock in the United States, a substantially equivalent quantity of potatoes produced in the United States was offered for sale to the Department of Agriculture, and had to be and was purchased by the Department under the Agricultural Act of 1948."

Respondent's motion to dismiss the complaint for failure to state a claim upon which relief could be granted was denied. 100 F. Supp. 30. However, at the close of petitioner's case and after argument of counsel, the court directed a verdict for respondent. Judgment was entered accordingly. The court's findings of fact and con-

---

to and expect to cooperate with the program. I am only bringing in seed for seed purposes. Canadian dealers are now quoting seed same territory I am selling. Have had quotations as low as 365 hundredweight delivered Norfolk, past week."

[2] "Less 10,000 Sax Canada No. 1 Seed Potatoes @ $3.65 f. o. b." These 10,000 sacks were immediately resold by the Atlantic Commission Company to respondent. Of them, 8,730 were invoiced by respondent on the same day as "Canada No. 1 Seed Potatoes" in seven lots to four separate dealers in Florida and Georgia, at prices between $3.75 and $4 per cwt. There was no evidence as to the disposition of the remaining 1,270 sacks.

300

clusions of law were contained in its oral opinion. That opinion, which has not been published, included the following highly significant statements:

"The action here is for breach of contract made between a Canadian exporter and Capps, the American importer, and specifically of a stipulation placed in that contract which the Court has held was for the benefit of the United States.

"The expression constituting that stipulation is that certified seed potatoes loaded on the S. S. *Gangway* are for planting in Florida and Georgia. Now, assuming that the Court is correct in holding that that stipulation is an agreement within the meaning of the Executive Treaty or an assurance, as it is called in the Executive Treaty, to the effect that the potatoes would not be diverted or reconsigned for table stock purposes—I say assuming that the Court is correct in holding that this provision is an assurance, there is no proof here sufficient to go to the jury that there has been such a diversion or reconsignment, or that there has been a lack of diligence or care on the part of this defendant to see to it that its assurance was carried out.

"In the first place, the only diversion or reconsignment was from the defendant to the Atlantic Commission Company. Now that was not a diversion or reconsignment for table stock purposes. Nor does it evidence any want of care on the part of the defendant to see that the assurance was kept, because the evidence shows that this defendant had from year to year sold to Atlantic, potatoes exclusively for seed purposes. The evidence does not justify or would not justify the jury in drawing a conclusion that it was a reckless abandonment by the defendant of its obligation to see to the use of

these potatoes because the defendant had the right to rely upon its previous experiences.

"But going further, and assuming that it was incumbent upon the defendant to follow up and see that this reconsignment did not lead to the use of the potatoes for table purposes, we find that the A & P, to whom Atlantic sold, did sell seed potatoes. It is true that it was not its entire trade in potatoes, but it did sell a large amount, described as its secondary function, for seed purposes, and the other sales by Atlantic to wholesalers or to the trade, as it is spoken of, were to firms which used potatoes for seed purposes or disposed of them for seed purposes, so that the sales by the defendant here were equally consistent with the compliance as with the violation of the assurance."

The Court of Appeals disagreed with the District Court on the above points.[3] However, it affirmed the judgment on the ground that the international agreement, which the contract between respondent and the exporter sought to carry out, was void. The court regarded it as not authorized by Congress and as contravening the provision for procedure through the Tariff Commission. The court also held that the suit must fail because no cause of action had been created by Congress for this type of injury. 204 F. 2d 655, 658–661. We granted certiorari to determine whether the significant constitutional and statutory questions discussed by the Court of Appeals were necessary for the decision of the case and, if so, to give them consideration. 346 U. S. 884.

We have first examined the record in order to pass upon the preliminary questions on which the Court of Ap-

[3] "We have little difficulty in seeing in the evidence breach of contract on the part of defendant and damage resulting to the United States from the breach." 204 F. 2d, at 658.

peals disagreed with the trial court. See *Walling* v. *General Industries Co.*, 330 U. S. 545, 547, 550, and see also, *Story Parchment Co.* v. *Paterson Parchment Co.*, 282 U. S. 555, 560, 567–568.

Respondent's alleged obligation is stated in its first telegram, which must be read in the light of the above-mentioned correspondence between the United States and Canada. That correspondence recognized that importations of Canadian seed potatoes, as well as of Canadian table stock potatoes, might displace eligible American potatoes in American commercial markets and thus might add to the burden of the American price-support program. The correspondence, nevertheless, did not seek to exclude Canadian seed potatoes. On the contrary, it provided for the continuance of shipments of seed potatoes to specified States in the United States, during a short period immediately prior to the normal seeding time. In addition, Canada agreed to require its exporters to secure assurance from each importer of Canadian seed potatoes that such potatoes would not be diverted or reconsigned for table stock purposes. In effect, this agreement stopped the regular Canadian-American trade in Canadian table stock potatoes, while preserving such trade in Canadian seed potatoes. There was no suggestion that each importer, during the short open season for Canadian seed potatoes, had to take any new or extraordinary affirmative steps to see to it that the ultimate purchasers never ate their seed potatoes, or that each American retailer of Canadian seed potatoes, in its usual course of business, segregated such potatoes from table stock potatoes in any manner not customary in the sale of seed potatoes.

The undisputed evidence showed that the entire shipment to Jacksonville was made in containers with markings and tags identifying the potatoes as "Canadian No. 1 seed potatoes." There was no showing that this identi-

fication was separated from the potatoes at any point short of the ultimate offering of some of the potatoes at retail. There was, in short, no evidence that any of the potatoes were at any time reconsigned or otherwise treated except as had been customary in prior commercial dealings in seed potatoes.

At Jacksonville the entire shipment was invoiced by respondent to the Atlantic Commission Company as "Canada No. 1 Seed Potatoes." Most of the 10,000 sacks (which, at the time of their delivery to that company in Jacksonville, were resold by it to respondent) were invoiced by respondent to other customers in a like manner.[4] The Atlantic Commission Company, in turn, invoiced to its purchasers, in the same manner, the sacks which it received from respondent. Of them, 13,627 sacks were invoiced by the Commission Company to its parent company, the Great Atlantic & Pacific Tea Company, at three points in Florida and one in Georgia, but 1,641 sacks were invoiced to points in Alabama. The Great Atlantic & Pacific Tea Company primarily sold foodstuffs but also dealt in vegetables for planting purposes, such as seed potatoes, onion sets and cabbage sets. It sold seed potatoes not only to home gardeners but to planters of small commercial acreages. The Commission Company invoiced the remaining 24,926 sacks to over 30 separate dealers in Florida and Georgia, but invoiced 2,309 to points in Alabama. All of the consignees were dealers in vegetables and groceries, and the primary volume of their trade was in articles for food. But there was testimony that some of these dealers customarily handled seed potatoes for planting purposes and there was no evidence that any of them did not. Respondent previously had sold seed potatoes to the Atlantic Commission Company and that company had used channels of distribution compara-

---

[4] See note 2, *supra*.

ble to those used in this instance. There was no evidence of the reconsignment of any of these seed potatoes for table stock, or of the diversion of any of them from the commercial channels theretofore usually used for sales of seed potatoes in this area during the planting season. Exception has not been taken to the States designated or to the times when the sales were to be made.

The evidence also did not support the suggestion that some of these potatoes were unsuitable for planting in the areas designated. It was not enough that one witness said that only 20% of the original shipment consisted of potatoes belonging to the three most popular varieties grown in Florida in that year.

There was no evidence of bad faith, neglect or carelessness on the part of respondent in performing its contractual obligations. There was no evidence of any intent of respondent that the potatoes be sold for table use. It freely acknowledged the existence of the international agreement and declared its purpose to cooperate with it.

It was conceded that these potatoes were specially suited for use as seed but also that they were of high-grade edible quality. There was, however, no evidence that any substantial part of these potatoes ultimately was eaten. The most that appeared was that ten pounds of the seed potatoes were sold by a grocery in St. Augustine, Florida, to two women who appeared to be housewives buying for home use. There was also evidence that a few potatoes, probably from the shipment, were sold to customers of the same type by a Jacksonville store and by an A & P market in Atlanta, Georgia.

In sum, all that respondent did was to sell seed potatoes, labeled as seed potatoes, in seeding time to concerns which normally dealt in seed potatoes. Under these circumstances, the District Court was not clearly in error in making the findings it did or in directing the verdict for respondent on the ground that no breach of contract

was shown.   *Walling* v. *General Industries Co.,* 330 U. S. 545.

In view of the foregoing, there is no occasion for us to consider the other questions discussed by the Court of Appeals.   The decision in this case does not rest upon them.

*Affirmed.*

APPENDIX TO OPINION OF THE COURT.

Exchange of notes between the Canadian Ambassador to the United States and the Acting Secretary of State of the United States, November 23, 1948:

"*The Canadian Ambassador to the Secretary of State*

"CANADIAN EMBASSY
"AMBASSADE DU CANADA

"WASHINGTON, D. C.,
"No. 538                                 "*November 23rd, 1948.*

"SIR,

"I have the honour to refer to the discussions which have taken place between the representatives of the Government of Canada and of the Government of the United States of America regarding the problems which would confront the Government of the United States in the operation of its price support and other programmes for potatoes if the imports of Canadian potatoes, during this current crop year, were to continue to be unrestricted. After careful consideration of the various representations which have been made to the Canadian Government on this subject, the Canadian Government is prepared to:

"1.  Include Irish potatoes in the list of commodities for which an export permit is required under the provisions of the Export and Import Permits Act.

"2. Withhold export permits for the movement of table stock potatoes to the United States proper, excluding Alaska.

"3. Issue export permits for the shipment of Canadian certified seed potatoes to the United States; but only under the following circumstances:

"(a) Export permits will be issued to Canadian exporters for shipments to specified States in the United States and such permits will only be granted within the structure of a specific schedule. The schedule is designed to direct the shipment of Canadian certified seed potatoes into those States where there is a legitimate demand for certified seed potatoes and only during a short period immediately prior to the normal seeding time. A draft of this schedule is now being jointly prepared by Canadian and United States officials.

"(b) Export permits would only be granted to Canadian exporters who could give evidence that they had firm orders from legitimate United States users of Canadian seed potatoes. Canadian exporters would also be required to have included in any contract into which they might enter with a United States seed potato importer a clause in which the importer would give an assurance that the potatoes would not be diverted or reconsigned for table stock purposes.

"(c) The Canadian Government would survey the supply of Canadian certified seed potatoes by class and consider the possibility of giving precedence to the export of Foundation and Foundation A classes of certified seed.

"(d) The names and addresses of the consignees entered on the export permit would be compiled periodically and this information would be forwarded to the United States Government.

"In instituting a system which has the effect of restricting exports of Canadian potatoes to the United States, the Canadian Government recognizes a responsibility to

the Canadian commercial grower in certain surplus potato areas and is prepared to guarantee a minimum return on gradable potatoes for which the grower cannot find a sales outlet. Although the details of such a programme have not been finalized, it is anticipated that the Canadian Government will announce, at approximately the same time as potatoes are placed under export control, a floor price which will be effective April 1st, 1949 for certain carlot shipping areas in the East. To implement this programme the Canadian Government would inspect the potato holdings of commercial growers in Prince Edward Island, and several counties of New Brunswick, on or after April 1st and would undertake to pay a fixed price for every hundred pounds of Canada No. 1 potatoes found in the bins. It is not anticipated that any actual payment would be made at that time and it would be understood that if any of the potatoes examined were subsequently sold or used for seed purposes the owner would forfeit any claim for assistance on such potatoes. In other words, the Canadian Government would make no payment on potatoes which move into export trade, or which are used for seed purposes.

"It should be noted that the Canadian proposals to institute export permit control on Canadian potatoes and to inaugurate a price support programme are contingent upon assurances from the United States Government that:

"a) The United States Government will not hereafter impose any quantitative limitations or fees on Canadian potatoes of the 1948 crop exported to the United States under the system of regulating the movement of potatoes from Canada to the United States outlined herein.

"b) The Canadian Government proposal, as outlined herein, to guarantee a floor price to certain commercial growers in the Maritime Provinces would not be interpreted by United States authorities as either a direct or

indirect subsidy and that in consequence there would be no grounds for the imposition of countervailing duties under Section 303 of the United States Tariff Act of 1930.[1]

"If the United States Government in its replying note accepts the Canadian proposals and gives to the Canadian Government the assurances required, as outlined above, this note and the reply thereto will constitute an agreement on this subject.

"Accept, Sir, the renewed assurances of my highest consideration.

"H H WRONG

"The Honourable GEORGE C. MARSHALL,
"Secretary of State of the United States,
"Washington, D. C.

---

*"The Acting Secretary of State to the Canadian Ambassador*

"NOVEMBER 23, 1948

"EXCELLENCY:

"The Government of the United States appreciates the assurance of the Government of Canada contained in your note no. 538 of November 23, 1948, that the Government of Canada is prepared, contingent upon the receipt of certain assurances from the Government of the United States, to establish the controls outlined therein over the exportation of potatoes from Canada to the United States.

"In view of the adverse effect which unrestricted imports of Canadian potatoes would have on the potato programs of the United States and the fact that it is anticipated that the Canadian proposal will substantially reduce the quantity of potatoes which would otherwise be imported into the United States, and in the interest of

---

" 1 46 Stat. 687."

international trade between the United States and Canada and other considerations, the United States Government assures the Canadian Government that it will not hereafter impose any quantitative limitations or fees on Canadian potatoes of the 1948 crop imported into the United States under the system of regulating the movement of potatoes to the United States outlined in the Canadian proposal.

"The Government of the United States also wishes to inform the Canadian Government with respect to that Government's proposal to guarantee a floor price to certain commercial growers in the Maritime Provinces, that in the opinion of the Treasury Department, the operation of such a proposal as outlined by the Canadian Government would not be considered as a payment or bestowal, directly or indirectly, of any bounty or grant upon the manufacture, production, or export of the potatoes concerned and no countervailing duty would, therefore, be levied, under the provisions of Section 303, Tariff Act of 1930, as a result of such operation of the proposal on potatoes imported from Canada.

"The United States Government agrees that your note under reference, together with this reply, will constitute an agreement on this subject.

"Accept, Excellency, the renewed assurances of my highest consideration.

"ROBERT A. LOVETT
"*Acting Secretary of State of the
United States of America*

"His Excellency
"HUME WRONG,
"*Ambassador of Canada.*"

Treaties and Other International Acts Series 1896, Department of State, Publication 3474.