**Ervin KAPLAN, Plaintiff,**

v.

**Donald E. JOHNSON, or successor as Administrator of Veterans Affairs of the United States Veterans Administration and John J. Corcoran, as General Counsel for the United States Veterans Administration, Defendants.**

No. 74 C 2004.

United States District Court, N. D. Illinois, E. D.

Feb. 18, 1976.

Harry M. Levy, Prangley, Dithmar, Vogel, Sandler & Stotland, Chicago, Ill., for plaintiff.

Samuel K. Skinner, U. S. Atty., Northern District of Illinois, Chicago, Ill., for defendants; Vito J. DiPieta, A. David Spevack, Neal C. Lawson, of counsel.

## MEMORANDUM OF DECISION

LYNCH, District Judge.

The controversy in the instant case revolves around a patent issued to plaintiff as the result of an invention he conceived and reduced to practice in 1970. The pivotal question in the case is whether plaintiff should be allowed to retain the ownership rights in said patent or whether the ownership rights properly accrue to the United States of America. The controversy arose in the following fashion.

The plaintiff is employed by the United States Veterans Administration. He has been so employed as a medical doctor for 20 years. For 15 of those 20 years, he has been the Chief of the Nuclear Medicine Service at the Veterans Administration Hospital in Hines, Illinois. Plaintiff's main duty was the administration of the Nuclear Medicine Service. However, plaintiff also acted in the capacities of clinician, teacher, and supervisor of research.

Some time in late 1969 or early 1970 plaintiff conceived a system for whole body imaging and count profiling with a scintillation camera. Plaintiff then set out to reduce his idea to a practical mechanism.

In January of 1970, plaintiff received $3,000.00 from the Picker Corporation to develop his invention. (The Picker Corporation later indicated an intent to donate this sum to the United States Government after plaintiff's invention was reduced to practice.) Plaintiff used this money to purchase and construct various components of the subject invention.

Mr. Michael Cooke, who was originally named as co-inventor but was subsequently removed from the patent application, was a research assistant employed by the VA and assisted the plaintiff in completing his invention. The first operable system was completed and reduced to practice on November 4, 1970.

Because plaintiff was an employee of the United States Government at the time he conceived of and reduced his invention to practice, the VA, mainly through its general counsel, John J. Corcoran, above-named defendant, embarked upon the procedure described in VA regulations 650–663 (38 C.F.R. Sections 1.650–1.663) with the purpose of determining the respective rights of the United States Government and the plaintiff in the subject invention. The VA regulations referred to above are based upon Executive Order 10096 which is

also embodied in 37 C.F.R. Section 100.1 et seq.

In an attempt to make a determination as to the ownership rights in the patent, the Office of General Counsel sent a letter to the director of Hines VA hospital requesting information about the conception and development of the invention.

The hospital administrator, Dr. Schlesinger, replied to the above request with a letter dated July 20, 1972, and certificates prepared and signed by plaintiff and Cooke. The certificates indicated that the invention was made during duty hours, with contributions by the VA of facilities, equipment, materials, funds and the services of other VA employees on official duty. The two men also indicated that the invention bore a direct relation to their official duties and was made in consequence of them. Dr. Schlesinger's letter indicated that 50% of Cooke's official duty time was spent on the project and that 25% of the plaintiff's official time was applied to the development. The letter also indicated that approximately $3,000.00 of VA funds were spent on components for the system and that the project had been reviewed and approved by the local research and education committee at Hines Hospital. Dr. Schlesinger later indicated that plaintiff was expected to engage in research pertinent to his specialty. Plaintiff has indicated that he prepared the letter which was signed by Dr. Schlesinger.

Based upon the above correspondence and the criteria set out in Executive Order 10096, the General Counsel to the VA felt that the agency was entitled to all the rights, title, and interest in the invention. The General Counsel informed plaintiff and Cooke in a letter dated February 27, 1973, that a preliminary review of the correspondence indicated that government ownership was likely. The two men were then given an opportunity to submit to the General Counsel whatever information they felt was relevant to the question of owner-ship. The plaintiff responded with a letter dated March 5, 1973.

In the March 5, 1973 letter, plaintiff asserted that the contribution of the government, as measured by the criteria in Executive Order 10096 (hereinafter E. O. 10096), was insufficient to equitably justify the assignment to the government of the entire title to the patent. The letter indicated that 85% of all the work on the invention was performed at a location other than Hines Hospital. Of the remaining 15% of the time spent on the project, 60% was said to be spent after normal working hours. This would leave 6% of the total project time consumed at Hines Hospital during regular working hours.

Plaintiff also pointed out that he was neither employed as an inventor nor employed or assigned to perform or supervise research even though it was expected that he might engage in these activities. The letter also indicated that although the Picker Corporation funds had been donated to Hines Hospital, the donation was not made until after the invention was reduced to practice. Furthermore, the VA Central Office had denied requests by plaintiff for research funding for the project.

A check of VA records indicated that a denial of funding had occurred on January 11, 1971. A second letter from Dr. Schlesinger indicated that the estimated government financial support for the project was actually $750.00 rather than the original figure of $3,000.00 contained in his first letter.

The variations between the separate estimates as to the government contribution to the subject project led to the preparation by the Assistant General Counsel of a memorandum sent to the Chief Medical Director at Hines. The memorandum cited the inconsistencies in the separate estimates and indicated that the question of ownership was extremely close. A copy of this memorandum was sent to Dr. Schlesinger who was requested to submit information which would resolve the inconsistencies. To this end, Dr. Schlesinger appointed Dr. Yvu Oes-

ter, Associate Chief of Staff for Research at Hines, to conduct an investigation and prepare a report.

Dr. Oester's report, dated June 6, 1973, divulged the following information. The government expended $1,023.49 on the project. No VA appropriated funds for fiscal years 1968 through 1970 were related to the invention. No VA funds appropriated for other projects were expended by Dr. Kaplan on the invention. The VA had never approved funds to be spent on the invention. There was no relation between VA approved projects and the present invention. Cooke was not specifically hired to work on the invention. Finally, the report indicated that the estimate of 6% of the total time spent on the project as occurring during official duty time was more accurate than the first estimate.

In a letter dated July 17, 1973, the Office of the General Counsel for the Veterans Administration made a determination of rights to the invention which was adverse to the plaintiff. The letter indicated that all the information gathered as a result of the inquiry showed, in the General Counsel's estimation, that plaintiff had failed to rebut the presumption of government ownership which is raised in E.O. 10096. Therefore, it was held that the government was entitled to the entire domestic right, title and interest in the invention.

The plaintiff appealed the above determination of rights to the Commissioner of Patents and the Commissioner affirmed the determination of the VA in a written opinion dated May 22, 1974.

The plaintiff then brought the instant proceeding in United States District Court. He predicated jurisdiction of the suit on the Administrative Procedure Act, 5 U.S.C. Section 551 *et seq.* seeking judicial review of the adverse administrative determination. Plaintiff also cited federal question jurisdiction, pursuant to 28 U.S.C. Section 1331, seeking a determination that E.O. 10096 is in violation of article I, section 8, clause 8 of the United States Constitution. This Court ruled that it had jurisdiction over the

controversy. Following that determination, the Administrative record was filed with this Court and the parties have filed cross motions for summary judgment.

The plaintiff has advanced several arguments to support his motion for summary judgment. The arguments are that:

(1) The July 17, 1973, decision of the VA is arbitrary and not based on substantial evidence;

(2) The July 17, 1973, decision of the VA was based on a mistake of fact;

(3) Both the VA decision and the later decision of the Commissioner of Patents were based on a mistake of law;

(4) Executive Order 10096, as applied by the VA and the Commissioner of Patents, is invalid under article I, section 8, clause 8 of the United States Constitution.

The Government, in opposing plaintiff's motion and in support of its cross motions for summary judgment, has argued that Executive Order 10096 is clearly constitutional, that it and other applicable law was properly applied in this case, and that there was substantial evidence to support the finding of the VA.

I

The VA, as well as the Commissioner of Patents, reached a decision adverse to plaintiff based upon the regulatory scheme outlined in E.O. 10096. The critical portions of this Executive Order are found at 37 C.F.R. Section 100.1 *et seq.* These portions of the order were also adopted as regulations by the VA and can be found at 38 C.F.R. Section 1.650 *et seq.* The critical part of E.O. 10096 can be found at 37 C.F.R. Section 100.6 which reads as follows:

§ 100.6 Determination of rights in and to inventions.

(a) Subject to review by the Commissioner as provided for in this part, each Government agency will determine the respective rights of the Government and of the inventor in

and to any invention made by a Government employee while under the administrative jurisdiction of such agency.

(b) The following rules shall be applied in determining the respective rights of the Government and of the inventor in and to any invention that is subject to the provisions of this part:

(1) The Government shall obtain, except as herein otherwise provided, the entire domestic right, title and interest in and to any invention made by any Government employee (i) during working hours, or (ii) with a contribution by the Government of facilities, equipment, materials, funds or information, or of time or services of other Government employees on official duty, or (iii) which bears a direct relation to or is made in consequence of the official duties of the inventor.

(2) In any case where the contribution of the Government, as measured by any one or more of the criteria set forth in subparagraph (1) of this paragraph, to the invention is insufficient equitably to justify a requirement of assignment to the Government of the entire domestic right, title, and interest in and to such invention, or in any case where the Government has insufficient interest in an invention to obtain the entire domestic right, title, and interest therein (although the Government could obtain same under subparagraph (i) of this paragraph), the Government agency concerned shall leave title to such invention in the employee, subject however, to the reservation to the Government of a nonexclusive, irrevocable, royalty-free license in the invention with power to grant licenses for all governmental purposes, such reservation in the terms thereof or where applicable in the terms required by 35 U.S.C. 266, to appear, where practicable, in any patent, domestic or foreign, which may issue on such invention.

(3) In applying the provisions of subparagraphs (1) and (2) of this paragraph to the facts and circumstances relating to the making of a particular invention, it shall be presumed that an invention made by an employee who is employed or assigned (i) to invent or improve or perfect any art, machine, design, manufacture or composition of matter, (ii) to conduct or perform research, development work, or both, (iii) to supervise, direct, coordinate, or review Government financed or conducted research, development work, or both, or (iv) to act in a liaison capacity among governmental or non-governmental agencies or individuals engaged in such research or development work, falls within the provisions of subparagraph (i) of this paragraph, and it shall be presumed that any invention made by any other employee falls within the provisions of subparagraph (2) of this paragraph. Either presumption may be rebutted by a showing of the facts and circumstances and shall not preclude a determination that these facts and circumstances justify leaving the entire right, title and interest in and to the invention in the Government employee, subject to law.

The Office of the General Counsel, in its decision of July 17, 1973, indicated that the circumstances of this case dictated that ownership of all the rights in the invention remain with the government because the project was conducted under the circumstances described in Section 100.6(b)(1) above and also because the nature of plaintiff's duties fell within the scope of Section 100.6(b)(3). Furthermore, the opinion indicated that the presumption of government ownership, which is raised under these circumstances, had not been rebutted. The Court will treat separately each one of the attacks mounted by the plaintiff against these findings.

## II

Plaintiff asserts that the VA's decision was based on a mistake of fact. His main contention in this respect is that the VA completely ignored Dr. Oester's report because it attributed the report's

preparation to plaintiff. Plaintiff asserts that this conclusion is supported by a passage from the General Counsel's brief to the Patent Office which stated:

> The foregoing remarks from the June 6, 1973 letter (The Oester report) which clearly contradict earlier assertions, were prepared by Dr. Kaplan for the signature of the Hospital Director as was all previous correspondence submitted from VA Hospital Hines.
>
> . . .

It must be pointed out that all the letters sent from Hines to the General Counsel in response to requests for information were issued in the name of Dr. Schlesinger, the hospital director. It has been admitted by plaintiff that all reports prior to the report of June 6, 1973, were prepared by him, i. e., the plaintiff, for Dr. Schlesinger's signature. Plaintiff now steadfastly asserts that he had nothing to do with the investigation conducted by Dr. Oester although the government contends that plaintiff did have a hand in accumulating information which was included in the June 6, 1973, report.

The administrative record now before this Court fails to shed any light that would allow for a definitive determination as to whether, or how much, Dr. Kaplan contributed to the report prepared by Dr. Oester for Dr. Schlesinger's signature. At any rate, there are several reasons which persuade this Court that it cannot overturn the VA's decision because of this alleged mistake of fact.

First, a study of the entire record, along with the reasoning of the General Counsel's decision, indicates that even if the General Counsel had been convinced that the June 6, 1973, report had been authored entirely by Dr. Oester the decision would not have been different. Although the June 6 report contained information which was more favorable to plaintiff's case than previous reports, it does not appear that even if the report were taken at face value that it would have compelled a decision favorable to plaintiff in light of the previously

tendered information. Furthermore, the language of the decision contains reference to information included in the June 6 report and seems to accept that information as true but still reached a decision adverse to the plaintiff.

Finally, it is possible that the excerpt from the General Counsel's brief before the Commissioner of Patents that is quoted above may have been employed in order to gain some leverage, from an adversarial standpoint, in that forum. This could have been the main motivation for including such a statement and not merely because there was a critical mistake of fact. There was no mistake of fact on the part of the Office of the General Counsel which would lead this Court to overturn the administrative decision.

### III

Plaintiff asserts that the VA's decision granting the entire title to the subject invention to the government was arbitrary and not based on substantial evidence.

According to the Administrative Procedure Act, specifically, 5 U.S.C. Section 706, a reviewing court should not set aside agency action unless, *inter alia*, the finding of the agency is found to be arbitrary, capricious, or not supported by substantial evidence.

Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis and the fact that on the same evidence the reviewing court could have reached a contrary decision will not support a determination that the action was arbitrary and capricious. *Carlisle Paper Box Co., v. N.L.R.B.*, 398 F.2d 1 (3rd Cir. 1968). Furthermore, "substantial" evidence has been described as evidence which will support a determination by an administrative agency to the extent that a reasonable mind might accept it as adequate to support the conclusion. It is something less than the weight of the evidence and the possibility of drawing two inferences and conclusions from the evidence does not prevent

an administrative agency's finding from being supported by substantial evidence. *Louisville & N. R. Co. v. United States*, 369 F.Supp. 621 (D.C.Ky.1973).

It is readily apparent from the preceding authorities on the "substantial evidence" rule that the party bearing the burden of persuasion has a cumbersome task in attempting to overturn a decision in an administrative proceeding. The Court has previously recited the various contradictory sets of facts concerning the development of the invention in question. There is a wide variance in the numerous reports submitted to the VA concerning the determination of rights in the invention.

At the outset it must be pointed out that if we assume the validity of Executive Order 10096 (E.O.10096), embodied in 37 C.F.R. Section 100.6, each and every one of the three reports submitted to the General Counsel would appear to call for an assignment of rights to the Government under the criteria set forth in Section 100.6(b)(1). The only hope that plaintiff had of escaping the provisions of that section would have been a finding under Section 100.6(b)(2) that the contribution of the Government to the invention was insufficient to equitably justify a requirement of assignment to the Government. Plaintiff has attempted to show in his brief and supporting documents that the failure to find that he fell within the latter category was arbitrary and capricious. Upon a thorough examination of the briefs and administrative record, this Court cannot agree with the plaintiff.

Plaintiff argues that the determination reached by the VA General Counsel and affirmed by the Commissioner of Patents could have been reached only if those decisions were reached after a total disregard of the third report (Oester Report) submitted to the General Counsel. Plaintiff asserts and emphasizes that this report was based on an independent investigation conducted by Dr. Oester in an attempt to resolve the apparent discrepancies in the two previously submitted reports. Plaintiff concludes that because the information contained in the Oester Report was favorable to his cause that it should have been conclusive on the question. This Court does not agree.

The basis of this disagreement centers around two major considerations. First this Court does not believe that the administrative decisions could have been reached only after a total disregard of the Oester Report. The two decisions do not indicate a specific rejection of the report and, in some instances, indicate that the report definitely was considered. However, as defendant points out, the report was only a portion of the evidence presented at the administrative level. Considering all the evidence in the case, the Oester Report need not be considered conclusive concerning this dispute.

Secondly, the Court notes that the first two reports submitted to the General Counsel were prepared by the plaintiff. These reports are not in conformity with the Oester Report. The significance of this observation is that although plaintiff characterizes the Oester Report as the only "independent" report, all the other reports were, in fact, prepared by plaintiff. One would think that the two prior reports would be self-serving and yet plaintiff is put in the unlikely position of arguing that an "independent report" is needed to controvert the assertions contained in his own reports.

It can be seen that plaintiff's first two reports were also part of the entire case presented at the administrative level. The fact that the plaintiff prepared those reports would appear to call for emphasis upon them and if representations contained in them were adverse to plaintiff's case then so be it.

Plaintiff argues that the first two reports were prepared without the aid of legal counsel and, therefore, should be discounted to a great extent. The Court notes, however, that the information supplied in the reports did not generally call for legal conclusions or expertise. The questions to which the report responded were straightforward and essen-

tially factual in nature. The presence or absence of legal advice in the preparation of the reports would be insignificant.

■ Based upon the preceding analysis, it is the opinion of this Court that plaintiff has failed to meet the heavy burden under the substantial evidence test referred to previously. The Court finds that the factual findings reached at the administrative level were neither arbitrary nor capricious based on the facts presented and the legal standards that were applied.

## IV

Plaintiff argues that the VA and the Commissioner erred in their application of the law relating to the assignment of rights to patents issued to government employees on inventions created during their government employment. According to this Court's immediately preceding analysis, the VA is entitled to the rights to the subject patent if it is conceded that E.O. 10096 is valid and the proper standard for a determination in this matter. The facts indicate that the invention was made at least partially during working hours, with a contribution by the government of facilities, equipment, funds and services of other government employees. Under Section 100.6(b)(1) of the E.O., the presence of any one of the above elements would call for an assignment of rights. In fact, all of the above elements are present in the instant case. Furthermore, Section 100.-6(b)(3) calls for a presumption of assignability when an invention is made by an employee who is assigned to perform research work or to supervise or coordinate government-financed research work. Plaintiff admits that one of his duties is to supervise research in the nuclear medicine division. In light of this admission, Section 100.6(b)(3) would further raise the presumption of assignability. The guidelines contained in the E.O. would appear to call for an assignment of rights. Notwithstanding this observation, plaintiff still asserts that the VA and the Commission made a mistake by not applying the proper legal analysis to the facts. Plaintiff's argument is based on the common law rights of government employees that were recognized in decisions of the Supreme Court in similar disputes. This contention raises serious problems in that although the critical decisions in this area were rendered prior to President Truman's issuance of E.O. 10096 in 1950, the import of the decisions appears, at least in part, to run contrary to the standards established in the E.O. The most significant decision rendered in this area was in the case of *United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933).

In *Dubilier,* the Court pointed out that by article I, section 8, clause 8, of the Constitution, Congress is given the power to promote the progress of science and the useful arts by securing for limited times to inventors the exclusive rights to their respective discoveries.

The Court pointed out further that the statutory scheme implementing our patent system gives rise to property rights. Under traditional analyses, the respective rights and obligations of employers and employees in patents obtained by employees through their inventions are governed by the contract of employment. If an employee's contract of employment calls for an assignment of the rights to any invention he may conceive in the course of his employment, then the employer will gain all the rights to that invention. The obvious rationale for this rule is that if an employee is hired to invent, and he succeeds, then he has produced that which he was employed to produce.

The Court held, however, that an assignment is not called for unless there is an express agreement to the effect that an assignment is required. This holding has been interpreted to mean that the agreement must be either express, implied from conduct, or through the terms of a specific employment or *assignment to invent.* See Finnegan and Poague, *Federal Employee Invention Rights-Time to Legislate,* 40 J.Pat.Off.Soc'y 252 (1958). (hereinafter Finnegan).

The Court pointed out that if the employment is general, although it covers a field of labor in which the employee conceived the invention, the contract is not broadly construed to require assignment. The Court's reluctance to imply or infer an agreement by the employee to assign his rights was due to its recognition of the peculiar nature of the act of invention whereby beneficial applications of the laws of nature are discovered. The Court recognized the merit of a system which grants recognition and rewards for the birth of ideas which are reduced to practice and are the product of original thought.

The Court, however, recognized that in the latter situation, where an employee is not required to assign all rights and title to the patent, the employee would be required under equitable principles to assign "shop rights" in the patent to his employer. Shop rights can be best described as an irrevocable, free, and non-exclusive license to the employer to use the employee's invention.

The Court then confronted the question of whether any of the above established principles would be modified when the employment in question was with the federal government. In this respect, the Court stated, "To the laws passed by the Congress, and to them alone, may we look for guidance as to the extent and the limitations of the respective rights of the inventor and the public." 289 U.S. at 189, 53 S.Ct. at 558, 77 L.Ed. at 1119.

After recognizing that no government employees, other than employees of the Patent Office, had been precluded by statute from applying for and receiving patents on their inventions, the Court alluded to its previous decisions which indicated that the fact of government employment did not call for a departure from general common law principles. The Court referred to its decision in *Solomons v. United States,* 137 U.S. 342, 11 S.Ct. 88, 34 L.Ed. 667 (1890) where the Court stated:

> The government has no more power to appropriate a man's property invested in a patent than it has to take his property invested in real estate; *nor does the mere fact that an inventor is, at the time of his invention, in the employ of the government transfer to it any title to or interest therein.* An employee, performing all the duties assigned to him in his department service, may exercise his inventive faculties in any direction he chooses, with the assurance that whatever invention he may thus conceive and perfect is his individual property. *There is no difference between the government and any other employer in this respect.* 137 U.S. at 346, 11 S.Ct. at 89, 34 L.Ed. at 669 (Court's emphasis.)

The Court also quoted from a later decision which reaffirmed the above proposition. In *Gill v. United States,* 160 U.S. 426, 16 S.Ct. 322, 40 L.Ed. 480 (1896), the Court said:

> There is no doubt whatever of the proposition laid down in Solomons' Case, that the mere fact that a person is in the employ of the government does not preclude him from making improvements in the machines with which he is connected, and obtaining patents therefor, as his individual property; and that in such case the government would have no more right to seize upon and appropriate such property than any other proprietor would have. . . . 160 U.S. at 435, 16 S.Ct. at 326, 40 L.Ed. at 483.

The controversy in *Dubilier* was concerned with patents obtained by two men, Dunmore and Lowell, who were employed in the radio laboratory of the Bureau of Standards which was within the Department of Commerce. Dunmore and Lowell were solely engaged in testing and research work. They were working on problems concerning airplane radios. Dunmore became interested and pursued a problem concerning "radio receiving sets" although this particular facet of the larger overall project relating to airplane radios was assigned to a group other than the one Dunmore supervised.

Dunmore and Lowell eventually conceived of and reduced to practice an in-

vention relating to the use of alternating currents in radio receiving sets. Upon advising his superior of the reduction to practice, Dunmore was encouraged to continue his work on the invention in order to perfect it. Dunmore and Lowell never attempted to conceal their work on the inventions and when they were encouraged to continue with their work no one advised them that they would be required to assign their rights in the patents to the government.

After the patents were issued to Dunmore and Lowell, who, in turn, had entered into an exclusive licensing agreement with the defendant, Dubilier Condenser Corporation, the government brought suit seeking declaratory relief in the form of a declaration that the United States held all right, title, and interest in the subject patents and for an accounting of all monies received as licensee. The District Court found in favor of the defendant and against the government. The Supreme Court eventually affirmed that decision upon a finding that an application of previously discussed common law principles to the facts of the case required that title be left with the licensee of the original invention with the condition that the government retain shop rights in the invention.

Plaintiff in the instant cause argues that the holding in the *Dubilier* decision mandates a finding in his favor. The government has answered this argument by advancing several theories as to why the Commission's decision is correct as a matter of law.

■ First, the government points out that it provided facilities, equipment, materials, and the efforts of other employees in order to further plaintiff's inventive efforts. The government points out further that a contribution of any of these elements calls for an assignment under the E.O. Nonetheless, the Court refused to order an assignment in the *Dubilier* case even though each of the above elements was present in that case.

■ The government also argues that the invention related to plaintiff's

official duties. This argument is based upon the June 6, 1972, letter of Doctor Schlesinger indicating that plaintiff was expected to engage in research. Under Section 100.6(b)(3) of the E.O., either the conduct or supervision of research results in a presumption of assignability. In *Dubilier,* the Court did not consider either the performance or the supervision of research to be an absolutely critical factor because Dunmore engaged in both. It is readily apparent that the Court desired to draw a distinction between employment calling for general research work and employment with the specific objective of invention. The Court held that even if an employee receives a general research assignment and ultimately invents a patented process or machine, he will not be required to assign his rights to the patent absent an express agreement or assignment to invent. The Court held this to be true even if the contract of employment covers a field of endeavor to which the invention relates.

Plaintiff argues vigorously that he was not hired with the expectation that he invent. He asserts that this argument is well supported by the fact that the subject invention was the only patentable invention he produced in twenty years of employment. Plaintiff is quick to point out that if he was hired with the expectation that he invent the government was certainly patient. In fact, he argues that such a lapse of time is a ready indicator that expectations of invention were not a part of the employment agreement.

The government argues that the plaintiff's acceptance and continuance of his employment with the government while the regulations based on the E.O. were in effect signifies acquiescence to the provisions of the regulations which must be considered tantamount to a contract of employment.

Plaintiff counters this argument by stating that he was never told about the pertinent regulations when he was hired. The obvious import of this observation is that if plaintiff did not know about the

regulations at the time of his employment, he could not have entered into an express agreement to be bound by its provisions.

The government points out that the provisions of the E.O. have been printed and published in the Federal Register and the Code of Federal Regulations. It argues that it is not necessary that every regulation concerning conditions of employment be called to the attention of employees for the provisions of the regulation to be considered effective. In effect, they argue that constructive notice through publication is sufficient to lead to a binding condition of employment.

The Attorney General prepared a report[1] for submission to the president in 1947 which was a catalyst for the formulation of E.O. 10096. The report attempted to draw a distinction between the type of assignment sought by the government in the *Dubilier* case and the type of assignment sought through the provisions of the E.O. The supposed distinction related to the lack of previous warning in the *Dubilier* case as opposed to the previous warning afforded by the E.O. It has been pointed out that the distinction is one merely of notice and critical commentary on this attempted distinction has resulted in the statement, "But notice, while effective in many fields of law to alter rights of parties is, of itself, an insufficient basis for the taking of either valuable rights or personal property."[2]

The Court is in agreement with the above observation that mere notice is an insufficient basis for the expropriation of a valuable property right such as the one in controversy here. The Court finds this to be particularly true where there is a well-established principle relating to ownership rights that is directly contradictory to the general import of the notice provisions.

Plaintiff quickly seizes upon the question of notice and the fact that he never received any. In fact, there is a strong similarity between *Dubilier* and the instant case in that the local research committee and Hines Hospital encourage plaintiff's efforts when informed of them and apparently made no indication to plaintiff that he would have to assign his rights to any resulting patents. The same type of reinforcement was present between Dunmore and his superiors in the *Dubilier* case.

One facet of the opinion of the Commissioner of Patents finding for the government in this case provides a great obstacle in the attempt to reconcile the provisions of the E.O. with the previous court decisions in this area. The Commissioner refers to the case of *Houghton v. United States*, 4 Cir., 23 F.2d 386, *cert. denied*, 277 U.S. 592, 48 S.Ct. 528, 72 L.Ed. 1004 which is generally cited as an exception to the general rule that a person must be hired to invent before a court will infer an agreement to assign. In *Houghton*, the Court of Appeals held that this was not an immutable rule and further held that in a situation where an employee was not necessarily hired to invent, but some time after he was hired, was specifically *assigned* to invent then there would be a proper inference of an agreement to assign due to the fact that the employee was then producing what he was assigned to produce. The Court has no quarrel with the rule in *Houghton* but is troubled by the context in which it was raised in the Commissioner's decision. The decision refers to the presumption of assignability caused by the provisions of Section 100.-6(b)(3) of the E.O. As previously recounted, this section calls for a presumption of assignability when an employee's duties include the conduct, or supervision, of research. This section, in one sense, adheres to the principle of the *Houghton* decision in that it emphasizes the nature of an employee's *assignments* rather than his original employment con-

1. United States Department of Justice, *Report and Recommendations of the Attorney General to the President.* Investigation of Government Patent Practices and Policies. ·(1947).

2. Gerber, *Patents-Inventions by Federal Employees and Contractors—Disposition of Title and Rewards,* 35 J. Pat. Off. Soc'y 426 (1953) at 429.

tract. The major difficulty with the E.O., however, is that although the *Houghton* decision relates to duties concerning *inventions,* the E.O. relates to duties in *general research.* This would appear to be a departure from the principles of the *Dubilier* case where a distinction was made between duties involving general testing and research as opposed to duties specifically relating to inventions. The Commissioner chose to extrapolate this doctrine of "duty" to what appears to this Court to be an unparalleled degree. The Commissioner determined that because the plaintiff was the chief of the Nuclear Medicine Service he could voluntarily undertake to solve a problem whose solution was the invention in question. The decision then indicates that because of plaintiff's position of authority his voluntary assumption of a problem arises to a level of a duty to solve it. The Court cannot agree with this conclusion which appears to fly in the face of reason. Such a conclusion is an unwarranted extension of an already strained attempt to reconcile two conflicting legal theories.

Finally, the government argues that the E.O. does not conflict with the *Dubilier* decision but only clarifies an ambiguity in that decision as to who is "hired to invent." The Court is in disagreement with this proposition. This disagreement is founded upon the obvious dichotomy between the Supreme Court's specific reliance in the *Dubilier* decision on the necessity of an assignment where the employment contract deals with specific duties to exercise inventive faculties rather than agreements to conduct general research and the thrust of the E.O. which calls for assignments in cases of general research efforts.

Rather than a clarification of the previously established principles, the Court perceives the E.O. to be a radical departure from these principles. It has been stated in Finnegan, *supra,* that:

It is believed fair to state that Executive Order 10096 is a remarkable departure from the law governing employee rights in inventions as it had been carefully developed by the Supreme Court in the sixty years before 1950 . . . . Executive Order 10096 on its face runs contrary to judicial principles which would otherwise obtain. (40 J.Pat.Off.Soc'y at 272–273)

A complete review of the evidence indicates that plaintiff would not be required to assign his title to the subject patent to the government under the principles of the *Dubilier* case. One significant difference between the two cases is that plaintiff has many duties other than research, including clinical work and teaching, whereas Dunmore and Lowell worked solely in the area of research. This distinction militates strongly in favor of the plaintiff retaining his title to the patent. The Court believes that under the *Dubilier* decision plaintiff should retain the title to the patent with the government obtaining "shop rights" to it. This conclusion varies with the conclusion reached by the Court when the provisions of the E.O. are applied to the facts of the case. This apparent conflict leaves the Court in the position of having to determine which is the proper legal analysis to apply. This necessity calls into play the plaintiff's assertion that E.O. 10096 is unconstitutional. The very language of the *Dubilier* decision tends to support this assertion. The Court deems it necessary to confront this question of constitutionality due to the point blank confrontation between the two legal theories of the parties and the inability of the Court to resolve this controversy without addressing this question.

## V

 This Court has jurisdiction to pass on the constitutionality of the subject E.O. which is contained in 37 C.F.R. Section 100.1 *et seq.* A three-judge court is not required in an action challenging the constitutionality of a section of the Code of Federal Regulations. *Holley v. United States,* 352 F.Supp. 175 (S.D.Ohio 1972) affd. 477 F.2d 600 (6th Cir. 1973).

The Court has already indicated its opinion that the E.O. is a significant departure from previously established common law principles that arose through a series of Supreme Court cases covering the better part of sixty years. The critical question becomes whether or not the president has the authority to alter those common law rights through the promulgation of an executive order.

The constitutionality of the E.O. has been questioned several times in the past. The authors of the Finnegan article cited above stated that, "At best, constitutionality of the order can be said to be subject to serious legal doubts. Uncertainty of its status has lingered in the absence of judicial test." 40 J.Pat. Off.Soc'y at 272. It was stated further in the Gerber article previously referred to that, "E.O. 10096 does not lie within the implied discretion of the President's delegated power but rather is arbitrary and a matter for legislative, not executive, consideration." 35 J.Pat.Off.Soc'y at 433.

The Congress has not enacted into law any legislation establishing a government-wide patent policy in this area. The subject E.O. appears to be a response to the Congress' inaction. Plaintiff, however, challenges the President's authority to take such action in light of article 1, section 8, clause 8. Although there is no plethora of case law in this area, there have been several decisions dealing with *ultra vires* acts of the president. The leading case in this area is *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1972).

In *Youngstown*, the Supreme Court was asked to decide whether the President was acting within his constitutional power when he issued an executive order directing the Secretary of Commerce to take possession of and operate most of the Nation's steel mills. The mill owners objected to this action on the ground that the order was tantamount to legislation that only the Congress had the authority to deal with.

The High Court pointed out that the President's power to act must stem either from an act of Congress or the Constitution itself. The Court observed that no statute had granted the President the power to take this action and, therefore, the only remaining source would have been the Constitution.

The Court rejected the notion that the E.O. was a proper exercise of his military power as Commander in Chief holding that the ultimate power to take possession of private property in order to keep labor disputes from stopping production rests in the Congress. The Court, furthermore, rejected the argument that the President's actions were proper in light of his duty to see that the laws are faithfully executed. In this vein, Justice Black stated:

> In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the law-making process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. (343 U.S. at 587, 72 S.Ct. at 567, 96 L.Ed. at 1167).

The Court held that there was no Constitutional provision which would allow the President to legally promulgate the seizure order in question and held such action to be unconstitutional.

Another example of void and unconstitutional executive action upon a finding that such action was an incursion upon the powers of Congress can be found in *United States v. Guy W. Capps, Inc.,* 204 F.2d 655 (4th Cir. 1953), affd. on other grounds 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329, where an executive agreement with Canada was found to be void as an attempt to avoid compliance with Congressional action in the area of foreign trade. Similar findings were made in the case of *Yoshida International, Inc. v. United States,* 378 F.Supp. 1155 (U.S. Cust.Ct.1974).

This Court perceives no basis for the promulgation of E.O. 10096 in the President's array of constitutional powers. The subject E.O. does not relate to his role as Commander in Chief of the Armed Forces. Neither does the order relate to the President's duty to see that the laws are properly executed because the order is not intended to be a means of implementing a legislative scheme passed by Congress but is, itself, in the form of a legislative scheme.

The government argues that the authority to issue the executive order is based upon various statutes, such as 5 U.S.C. Section 7301, wherein the President is authorized to prescribe regulations governing the conduct of, and conditions of employment for, employees of the executive branch.

■ The Court has no quarrel with the proposition that the President has the power to regulate certain conditions of employment in the executive branch. However, this power is not unbridled and the limits of Presidential discretion are stretched to the breaking point when they conflict with the basic right of any citizen, whether he be a government employee or not, to his property and freedom. The Supreme Court explicitly indicated in *Dubilier* that no distinction should be made between a private citizen and a government employee when it comes to rights in a patent. This Court does not believe that Presidential discretion extends as far as is attempted in E.O. 10096. The order goes beyond a simple condition of employment and entails the expropriation of a potentially valuable property right. Absent legislation indicating Congressional intent to alter the present state of the law relating to awards issuing to inventors, the President lacks the authority to implement regulations resulting in such a substantial alteration.

There are several statutes which indicate that Congress does not favor the expropriation by the government of a government employee's rights in an invention. Section 266 of Title 35 of the United States Code indicates that a governmental employee may be granted a patent free, without the payment of any fees to the Patent Office, if he grants to the government shop rights in his invention. This section appears to be an incentive to invent induced through the acquisition of valuable rights without the expenditure of personal funds.

A 1952 amendment to 28 U.S.C. Section 1498 grants to a government employee the right to sue the government in the Court of Claims for compensation if the government is guilty of infringement. The House Committee on Patents commented on this bill by stating that, "The right to sue, pursuant to this bill, in large part, follows title under the present law as reestablished by the *Dubilier* case and similar decisions." [3] The Finnegan article commented on this provision by stating:

> This, the most recent congressional declaration in the field of employee invention rights, demonstrates legislative recognition of the judicial standards established in the *Dubilier* and other opinions, although here too the statutory language is imprecise. (40 J.Pat.Off.Soc'y at 280)

This amendment was passed two years after the issuance of the E.O. but still indicates Congressional recognition of the *Dubilier* decision. It cannot be gainsaid under such circumstances that the Congress recognized, or desired, a change in common law rights resulting from the issuance of the E.O.

Plaintiff points out that Congress has passed legislation dealing with the rights to patents developed in the execution of work done by NASA and the Atomic Energy Commission (now the Energy Research and Development Administration). This is a telling point in that it can be reasonably argued that if the Congress meant to establish a government-wide policy, or a policy within the Veterans Administration, it could and

---

3. H.R.Rep.No.1726, 82nd Cong., 2d Sess., 3 (1952).

would have done so as it did in the case of the two mentioned agencies. The failure to enact such legislation leads to an inference that at least to this date it does not desire such a change.

The government argues that "The overriding public policy today is that the Government should obtain title, on behalf of all its citizens, to inventions in which it has contributed time, materials or money." The Court considers this statement unconvincing in terms of the constitutional attack in light of the fact that Congress, more often than not, is called upon to take action in relation to "overriding public policies." Such an argument closely approaches the argument of those who question the prudence of our entire patent system.

To those who question the fundamentals of the patent system, government ownership of inventions, which in practice amounts to public dedication, seems a salutary policy. However, dedication prevents operation of the strong public policy factors which underlie the constitutionally created monopoly of the patent grant. (40 J.Pat. Off.Soc'y at 341)

Whatever one's feelings might be about our patent system, it is certain that it is not the function of the judicial or the executive branch to bring about wholesale changes in the system. There can be no doubt that article I, section 8, clause 8 of the Constitution leaves that task solely in the hands of Congress.

Congress has not imposed any general contract obligation on government employees to assign their rights in their patents to the government. Having observed this point, the Court stated in *Dubilier:*

All of this legislative history emphasizes what we have stated—that the courts are incompetent to answer the difficult question whether the patentee is to be allowed his exclusive right or compelled to dedicate his invention to the public. It is suggested that the election rests with the authoritative officers of the government. Under what power, express or implied, may such officers, by administrative fiat, determine the nature and extent of rights exercised under a charter granted a patentee pursuant to constitutional and legislative provisions? Apart from the fact that express authority is nowhere to be found, the question arises, Who are the authoritative officers whose determination shall bind the United States and the patentee?

* * * * * *

Hitherto both the executive and the legislative branches of the government have concurred in what we consider the correct view,—that any such declaration of policy must come from Congress and that no power to declare it is vested in administrative officers. (289 U.S. at 208–209, 53 S.Ct. at 565, 77 L.Ed. at 1129.)

This Court must agree with this pronouncement. It is the duty of Congress through legislation, not the executive branch through administrative fiat, to declare the policy contained in E.O. 10096.

A particular passage from the decision in *Youngstown* seems particularly appropriate in this case:

The power of Congress to adopt such public policies as those proclaimed by the order is beyond question. It can authorize the taking of private property for public use. It can make laws regulating the relationships between employers and employees . . . fixing wages and working conditions in certain fields of our economy. The Constitution did not subject this law-making power of Congress to presidential or military supervision or control.

* * * * * *

The Founders of this Nation entrusted the law making power to the Congress alone in both good and bad times. It would do no good to recall the historical events, the fears of power and the hopes for freedom that lay behind their choice. Such a review would but confirm our holding that this seizure

order cannot stand. (343 U.S. at 588–589, 72 S.Ct. at 867, 96 L.Ed. at 1168)

█ Based upon the preceding analysis, it is the opinion of this Court that the President lacked the authority to unilaterally promulgate E.O. 10096. The provisions of the order are a violation of the separation of powers sought by the architects of our governmental system. The E.O. is, in fact, a unilateral promulgation which cannot be considered a part of the contract of employment so as to bind governmental employees under the principles of the *Dubilier* case. Absent this element of agreement between the parties, the order is little more than a unilateral statement of policy, in the style of legislation, treating rewards to be issued, or withheld, from inventors. The Constitution specifically reserves to Congress the authority to establish such policies and the attempts by the executive branch to make incursions on Congress' authority are unwarranted and without force and effect. Consequently, this Court is compelled to find that the E.O. is unconstitutional and of no effect on the merits of this case. Furthermore, the Court finds that the *Dubilier* decision compels a finding in favor of the plaintiff and against the defendants.

## CONCLUSION

█ The decision of the General Counsel for the Veterans Administration, later affirmed by the Commissioner of Patents, is hereby reversed. Defendants are permanently enjoined from taking any action that would require plaintiff to assign his interest in United States Patent No. 3,839,611 to the government of the United States with the exception that plaintiff is ordered to grant to the government an irrevocable, free, and non-exclusive license for the use of the subject invention. Plaintiff is declared to be entitled to the entire domestic right, title, and interest in said invention with the exception of the shop right granted to the government.

An Order will be entered granting plaintiff's motion for summary judgment and denying defendants' cross motion for summary judgment.