**Robert DOLE, Plaintiff,**

v.

**Jimmy CARTER, President of the United States of America, Defendant.**

**Civ. A. No. 77–2310.**

United States District Court,
D. Kansas.

Dec. 30, 1977.

Kenneth E. Holm, of Boddington & Brown, Kansas City, Kan., for plaintiff.

James P. Buchele, U. S. Atty., James Oliver Martin, Asst. U. S. Atty., Kansas City, Kan., for defendant.

## MEMORANDUM AND ORDER

O'CONNOR, District Judge.

This case, a declaratory judgment action seeking to enjoin the President of the United States from returning to the People's Republic of Hungary the Hungarian coronation regalia, is now before the court for determination of the plaintiff's motion for a preliminary injunction. The action was filed on December 23, 1977, eight days after release of a joint communique by the governments of the United States and Hungary to the effect that said regalia, safeguarded in the United States since the close of World War II, would be returned to the people of Hungary in ceremonies in Budapest on January 6 and 7, 1978. On the same day that this action was filed, the court held a hearing, attended by counsel for both parties, on the plaintiff's motion for a temporary restraining order. Said motion was denied upon the court's receipt of assurances by defense counsel that the President would retain custody of the coronation regalia until such time as the court could hear the plaintiff's motion for a preliminary injunction and render a decision thereon. On December 29, 1977, the court conducted an expedited hearing on the latter motion, together with the motion to dismiss or, in the alternative, a motion for summary judgment filed by defendant. In view of the urgent circumstances surrounding the litigation and adjudication of the claims advanced herein, the court has had little opportunity to prepare an extensive opinion expounding upon the vast array of constitutional, political, and legal issues in this case. Nevertheless, after scrutinizing the relevant law in light of the facts developed in the record before us, the court is convinced that the plaintiff's motion for a preliminary injunction must be denied.

The salient facts in this case, briefly summarized, are as follows: In approximately 1000 A.D., Pope Sylvester II donated to Stephen, then Duke of Hungary, a crown establishing Stephen as the first King of Hungary and declaring Hungary a state in the international system of Europe. This crown, which became known as the Holy Crown of St. Stephen or the Holy Crown of Hungary, thereafter assumed extraordinary historical importance to the people of Hungary, symbolizing both the constitutional monarchy of Hungary and the freedom of religion from governmental interference in Hungary. The Holy Crown apparently remained in Hungarian custody from 1000 A.D. until July 25, 1945, shortly after the surrender of all German forces in Europe at the conclusion of World War II but prior to the signing of the Paris Peace Treaty of February 10, 1947, 61 Stat. 2065, ending the state of war between the Allied Powers and Hungary. At that time the Hungarian Commander of the Crown Guards entrusted to the United States for safekeeping the Holy Crown and other coronation regalia including the Coronation Robe, Orb, Sceptre and Sword. To date, the United States has secured said regalia in an undisclosed location with a view to its eventual return to the people of Hungary.

As previously noted, on December 15, 1977, the United States and Hungarian

governments jointly announced that the President of the United States had determined it "appropriate and fitting" that the Hungarian coronation regalia be returned to the people of Hungary at ceremonies on January 6 and 7, 1978, and that it be thereafter placed on permanent public display in an appropriate historical location in Budapest for "the population of the country, Hungarians living abroad, and foreigners alike to see." This communique resulted from an exchange of diplomatic letters on December 13, 1977, outlining various agreements of the United States and Hungary as to the conditions under which the coronation regalia was to be returned, the nature of the attendant ceremonies, and ceremonial objectives of emphasizing "traditional United States—Hungarian ties, friendship between our two peoples, and our mutual desire to continue the development of better bilateral relations." Announcement of the proposed return of the Holy Crown generated not inconsiderable public controversy in various sectors, including groups of Hungarian nationals in the United States and elsewhere, members of the Roman Catholic Church, and certain members of the United States Senate and House of Representatives.

On December 23, 1977, Robert Dole, a United States Senator from the State of Kansas, filed the instant action seeking to enjoin delivery of the Holy Crown and coronation regalia to the People's Republic of Hungary on the ground that such action, undertaken by the President without the prior advice and consent of the United States Senate, constitutes a violation of Article II, Section 2, of the Constitution of the United States. That constitutional provision, in relevant part, confers upon the President the power, "by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." The plaintiff's argument is premised upon his factual assertion that the subject of custody of the Holy Crown was by tacit agreement of the American and Hungarian authorities deliberately omitted from the text of the Paris Peace Treaty of February 10, 1947, in order to prevent the Soviet Union—a co-signer of the Treaty, then occupying Hungary—from asserting any claim of right to possession thereof. According to the plaintiff, the American and Hungarian authorities not only agreed that the Paris Peace Treaty would be silent on this subject; they also tacitly agreed that (1) the United States would retain custody of the coronation regalia until such time as Soviet troops were withdrawn from Hungary in accord with Article 22 of the Paris Peace Treaty; and (2) return of the regalia would be effectuated only after negotiation of an appropriate treaty between the United States and a legitimate Hungarian government at some future date. The plaintiff contends that this "silent agreement" is an integral part of the Paris Peace Treaty of 1947 that cannot be varied or modified without the making of another formal treaty ratified by the Senate. In the alternative, he claims that any agreement to return the coronation regalia to Hungary in and of itself constitutes a new bilateral treaty for which the President must seek Senate approval. Therefore, the President's unilateral undertaking to return said regalia, evidenced by the December 13, 1977, exchange of letters, is said to be *ultra vires* and beyond the scope of his lawful constitutional authority.

In assessing the merits of the plaintiff's motion for injunctive relief, the court commences with the fundamental rule of law that a preliminary injunction is an "extraordinary remedy" that should be granted only upon a proper showing. The burden is clearly upon one requesting such relief to make a "prima facie case showing a reasonable probability" that he will ultimately prevail on the merits of his claim. *E. g., Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181 (10th Cir. 1975); *Continental Oil Company v. Frontier Refining Company*, 338 F.2d 780 (10th Cir. 1964). In addition, the applicant has the burden of showing that "irreparable injury" will result if the requested injunction is not granted. *E. g., Chris-Craft Industries, Inc. v. Bangor Punta Corp.*, 426 F.2d 569 (2 Cir. 1970); *Crowther v. Seaborg*, 415 F.2d 437 (10th Cir. 1969).

In determining whether the plaintiff here has established a reasonable probability of success on the merits of his claim, the court must confront the two crucial issues in this case: (1) whether the alleged "tacit agreement" is such an integral part of the Paris Peace Treaty that it can be modified only by enactment of a formal treaty approved by a two-thirds vote of the Senate; and (2) whether the President's agreement to return the Hungarian coronation regalia constitutes a treaty obligation that must be ratified by the Senate.

■ The first issue must be resolved contrary to the plaintiff's argument. The only evidence he produces in support thereof consists of affidavits by individuals who allegedly are familiar with the circumstances under which the coronation regalia was turned over to American authorities. No affidavits have been provided from individuals who were involved in the actual treaty negotiation process. Defendant, however, has provided us with the affidavit of Mark B. Feldman, Deputy Legal Advisor of the Department of State. Mr. Feldman states that after having searched all relevant files he "has not discovered any indication of any understanding between United States and Hungarian authorities concerning the application or nonapplication of the 1947 Treaty of Peace to the Crown of St. Stephen, tacit or otherwise." The record is void of anything indicating that Hungarian officials who approved the 1947 Paris Peace Treaty, President Truman, and United States Senators who voted in favor of ratification of the treaty, were aware of and understood the "silent agreement by tacit omission." The court is not impressed with plaintiff's contention that this alleged "silent agreement" can rise to the level of a formal treaty which can only be modified by another formal treaty ratified by the Senate.

■ We turn now to the plaintiff's argument that the agreement to return the coronation regalia to Hungary in and of itself constitutes a treaty which must be ratified by the Senate. It is well established, and even plaintiff admits, that the United States frequently enters into international agreements other than treaties. Indeed, as of January 1, 1972, the United States was a party to 5,306 international agreements, only 947 of which were treaties and 4,359 of which were international agreements other than treaties. See J. Murphy, *Treaties and International Agreements*, 23 Kan.L.Rev. 221, 223 n. 15 (1975).[1] These "other agreements" appear to fall into three categories: (1) so-called Congressional-Executive agreements, executed by the President upon specific authorizing legislation from the Congress; (2) executive agreements pursuant to treaty, executed by the President in accord with specific instructions found in a prior, formal treaty; and (3) executive agreements executed pursuant to the President's own constitutional authority (hereinafter referred to as "executive agreements"). See RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED STATES §§ 119–121 (1965). Defendant contends that his agreement to return the coronation regalia to Hungary falls into the latter category, and the court agrees.

Section 121 of the Restatement (Second) of the Foreign Relations Law of the United States reads as follows:

"§ 121. Scope of Executive Agreement Pursuant to President's Constitutional Authority.

An international agreement made by the United States as an executive agreement without reference to a treaty or act of Congress may, subject to the limitations indicated in § 117, deal with any matter that under the Constitution falls within the independent powers of the President."

Specific constitutional grants of power to the President are scattered throughout Article II. The "executive Power" is vested in

---

1. Citing statement of John R. Stevenson, Legal Advisor, Department of State, in Sub-committee on Separation of Powers, Senate Committee on the Judiciary Ninety-second Congress Second Session Hearings on Congressional Oversight of Executive Agreements 249 (Commercial Print, 1972).

the President (Article II, Section 1) and this provision has traditionally been cited as the authority for the President to conduct the foreign relations of the United States. See Comment to Section 121 of the RESTATEMENT (SECOND), *supra*. The President is also the "Commander in Chief of the Army and Navy" (Article II, Section 2); is empowered to make treaties, and to nominate and appoint ambassadors and other public ministers and consuls, with the "Advice and Consent of the Senate" (Article II, Section 2); and is also given the obligation to see that the "Laws be faithfully executed" (Article II, Section 3).

The Supreme Court has long ago recognized that the President has the "power to make such international agreements as do not constitute treaties in the constitutional sense." [2] *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936), citing *Altman & Co. v. United States*, 224 U.S. 583, 600–601, 32 S.Ct. 593, 56 L.Ed. 894 (1912). This power, although not "expressly affirmed by the Constitution," nevertheless exists "as inherently inseparable from the conception of nationality." The justifications for the power are found "not in the provisions of the Constitution, but in the law of nations." *Curtiss-Wright*, 299 U.S. at 318, 57 S.Ct. at 220.

Since the *Curtiss-Wright* decision, the Supreme Court has twice upheld the validity of an executive agreement made by President Franklin Roosevelt with the Soviet Union. In the Litvinov Agreement, the President recognized and established diplomatic relations with that nation. In addition, for the purpose of bringing about a final settlement of claims and counterclaims between the Soviet Union and the United States, it was agreed that the Soviet Union would take no steps to enforce claims against American nationals, but all such claims were assigned to the United States with the understanding that the Soviet Union would be notified of all amounts realized by the United States. In speaking for the Court in *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), Justice Sutherland, who also authored the majority opinion in *Curtiss-Wright, supra*, stated:

"[A]n international compact, as this was, is not always a treaty which requires the participation of the Senate. There are many such compacts, of which a protocol, a modus vivendi, a postal convention, and agreements like that now under consideration are illustrations." 301 U.S. at 330–331, 57 S.Ct. at 761.

Justice Sutherland further expounded upon the nature of executive agreements in *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942):

"Recognition is not always absolute; it is sometimes conditional. . . . Power to remove such obstacles to full recognition as settlement of claims of our nationals . . . certainly is a modest implied power of the President who is the 'sole organ of the federal government in the field of international relations.' . . . Effectiveness in handling the delicate problems of foreign relations requires no less. Unless such a power exists, the power of recognition might be thwarted or seriously diluted. No such obstacle can be placed in the way of rehabilitation of relations between this country and another nation, unless the historic conception of the powers and responsibilities of the President in the conduct of foreign affairs . . . is to be drastically revised." 315 U.S. at 229–230, 62 S.Ct. at 565 (citations omitted).

The problem of what the President may or may not do without formal Senate consent is one of line-drawing. As one prominent author has put it, "One is compelled to conclude that there are agreements which the President can make on his sole authority and others which he can make only with the consent of the Senate, but neither Justice Sutherland nor anyone else has told us

---

**2.** Treaties are mentioned in three constitutional provisions other than Article II, Section 2. None of these provisions make any attempt at definition. U.S.Const., Art. I, § 10; Art. III, § 2; Art. VI.

which are which." L. Henkin, *Foreign Affairs and the Constitution*, p. 179 (The Foundation Press, 1972). We need not attempt to reach the constitutional perimeters of this problem, however, for we are of the opinion that the transaction which gave rise to this lawsuit has the indicia of an executive agreement.

The court attaches considerable weight to the quoted language from the *Pink* case. It is true that the United States does, at this time, formally "recognize" the Hungarian government. However, as counsel discussed at oral argument, relations between the United States and Hungary, as well as other Eastern European countries, have not been "normalized" since the end of World War II. The United States' continued dominion over the Hungarian coronation regalia, in which this country claims no property interest, can reasonably be viewed as a serious "obstacle" which may impede the "rehabilitation of relations" between the United States and Hungary. The decision to remove such an obstacle appears to be well within the traditional powers of the President.[3]

As noted above, neither the Constitution nor the relevant case law offers significant legal guidance as to which kinds of international agreements must be concluded in "treaty" form subject to the advice and consent of the Senate, and which kinds of agreements may be concluded on the independent executive authority of the President in the area of foreign affairs. However, the court's review of authorities on the subject of treaties indicates that by common practice from the beginning of the Republic, treaties have customarily exhibited such fundamental characteristics as substantial ongoing defense or political commitments on the part of the United States and substantial ongoing reciprocal commitments by co-signers. The very substantiality of the bilateral commitments traditionally embodied in treaties underlies the Article II, Section 2, requirement of Senatorial con-

sent and, in addition, occasions the formality and deliberation with which treaties are generally negotiated and executed. It appears that these characteristics are often lacking in the case of executive agreements. While such agreements are recognized as having the same effect as treaties in international law, they may involve such relatively minor subjects as the "administrative working details for carrying out a treaty or agreement" or be "in the nature of commercial contracts relating to sales of equipment and commodities." 1972 U.S.Cong. and Admin.News, p. 3069. The United States enters into approximately 200 executive agreements each year, *Id.* at 3068, and it has been observed that the constitutional system "could not last a month" if the President sought Senate or Congressional consent for every one of them. L. Henkin, *Foreign Affairs and the Constitution, supra*, at 182. Congress itself recognized this fact in passing P.L. 92–403, 1 U.S.C. § 112b, requiring the Secretary of State to transmit for merely informational purposes the text of all international agreements other than treaties to which the United States becomes a party. The House Committee on Foreign Affairs stated in recommending passage of that statute that while it wished to be apprised of "all agreements of any significance," "[c]learly the Congress does not want to be inundated with trivia." 1972 U.S.Code Cong. and Admin.News, p. 3069.

While the President's undertaking to return the Hungarian coronation regalia is hardly a "trivial" matter to either the United States or the people of Hungary, the court is yet convinced that the President's agreement in this regard lacks the magnitude of agreements customarily concluded in treaty form. The President's agreement here involves no substantial ongoing commitment on the part of the United States, exposes the United States to no appreciable discernible risks, and contemplates American action of an extremely limited duration in time. The plaintiff presented no evidence that agreements of the kind in ques-

---

**3.** Indeed, as noted earlier, the government has indicated that a prime purpose of the return of the coronation regalia and the attendant cere-

mony is to aid the "development of better bilateral relations" between the two countries.

tion here are traditionally concluded only by treaty, either as a matter of American custom or as a matter of international law. Indeed, while the court has not exhaustively examined all possibly pertinent treaties, the court can hardly imagine that any such examination would lend support to the plaintiff's position. Finally, the agreement here encompasses no substantial reciprocal commitments by the Hungarian government. As a matter of law, the court is therefore persuaded that the President's agreement to return the Hungarian coronation regalia is not a commitment requiring the advice and consent of the Senate under Article II, Section 2, of the Constitution.

For all of the foregoing reasons, the court must conclude that the plaintiff has demonstrated no reasonable probability of ultimate success on the merits of his claim. This finding necessarily requires the court to deny the plaintiff's application for preliminary injunctive relief.

In rendering a decision grounded solely on the preliminary injunction question, we have assumed without deciding that plaintiff has standing to bring this action and that the court has jurisdiction of the subject matter. Determination of those matters, together with the defendant's motions to dismiss or, in the alternative, for summary judgment, will be necessary only if the case proceeds beyond the preliminary injunction stage. The court has also considered plaintiff's "Motion in Camera" and the same is denied.

At the time this case was submitted, counsel for each side requested the court to stay any order granting or denying a preliminary injunction pending appeal of such order by the non-prevailing party. For the reasons expressed herein, plaintiff's motion for stay under Rule 62(c), Federal Rules of Civil Procedure, is denied.

The clerk is directed to enter the attached Journal Entry of Judgment denying a preliminary injunction.

IT IS SO ORDERED.