**Victor M. GUERRA, d/b/a Guerra's T. D. F. Warehouse, Plaintiff,**

v.

**Eduardo GUAJARDO, District Director of Customs, Laredo District No. 23, and Albert Bazemore, Regional Commissioner of Customs, Defendants.**

**RONNIE GUERRA'S INTERNATIONAL TRADERS, INC., Ronaldo E. Guerra, Inc., and Ronald E. Guerra, Individually, Plaintiffs,**

v.

**Eduardo GUAJARDO, District Director, U. S. Customs Service, Defendant.**

Civ. A. Nos. B–78–215, B–78–216.

United States District Court,
S. D. Texas,
Brownsville Division.

Oct. 10, 1978.

James Roby Clopton, McAllen, Tex., for plaintiff Victor M. Guerra, d/b/a Guerra's T. D. F. Warehouse.

Guerra & Duvall, C. H. Duvall, Roma, Tex., for plaintiffs Ronnie Guerra's International Traders, Inc., Ronaldo E. Guerra, Inc., and Ronaldo E. Guerra, Individually.

J. A. "Tony" Canales, U. S. Atty., Houston, Tex., John P. Smith and Charles Lewis, Asst. U. S. Attys., Brownsville, Tex., for defendants.

MEMORANDUM AND ORDER

GARZA, Chief Judge.

This is an action for a preliminary injunction. The Plaintiffs are engaged in the

import-export business. The present case involves the importation of powdered milk from Canada which is then sold from bonded warehouses belonging to Plaintiffs to purchasers who transport the goods to Mexico. The price of such powdered milk is less than half that of powdered milk purchased at retail in the United States. The Defendants are the Laredo District Director and the Regional Commissioner of the United States Customs Service.

On August 23, 1978, the Plaintiffs filed a Complaint for Temporary Restraining Order which also sought a preliminary and permanent injunction, and a declaratory judgment. A Temporary Restraining Order was signed the following day. A hearing on the preliminary injunction was held on September 6, 1978, in which the Plaintiff Ronaldo Guerra testified, predominantly on the issue of damages. Attorneys for both parties were requested by the Court to submit briefs within ten days of the hearing. An extension of seven days was granted on September 18, 1978. The actions were consolidated on October 3, 1978. The Temporary Restraining Order has been kept in force during the pendency of these proceedings.

A brief recitation of the facts in this case is necessary for a full understanding of the variegated allegations proffered by both parties. On September 30, 1976, the United States of America and the United Mexican States entered into an agreement providing for mutual assistance between the Customs Services of the two countries [hereinafter the "Mutual Assistance Agreement"].[1] The agreement obligates each party to prevent,

investigate and repress breaches of Mexican and American Customs laws.[2] Pursuant to this agreement, the United States Customs Service received a written request, dated June 13, 1978, from the Mexican government asking for all possible documentation related to the exportation of powdered milk from the United States into Mexico from October 1, 1977 to the present.

The Defendant Regional Commissioner was instructed by Customs officials to release to Mexican Customs the names of the consignees, dates of exportation and the final destination of the powdered milk. This information was gleaned from forms which exporters filed with the United States Customs Service.[3] This information was furnished to Mexican Customs in July and August of 1978. Soon thereafter, the Plaintiffs directed written requests to the United States Customs Service asking that the Service withhold from disclosing information concerning these exportations. The Customs Service informed the Plaintiffs that pursuant to the Mutual Assistance Agreement the Service was under an obligation to disclose such information.

This action was subsequently brought to enjoin the United States Customs Service from disclosing further information of a similar nature. Plaintiffs, in their Complaints and in their briefs, alleged several grounds upon which relief should be granted. Initially, Plaintiffs claim that the Defendants have violated Article I, § 8 of the United States Constitution[4] in that their actions amount to a usurpation of Congress' sole power to regulate commerce. The Plaintiffs also contend that such actions

---

1. T.D. 77–58. The parties have stipulated that the said Agreement went into effect on January 26, 1977. The parties have further stipulated that this Agreement does amount to an executive agreement.

2. The breaches referred to in the present case involve the prevention of suspected wide scale bribery of Mexican Customs officials in the transporting of powered milk into Mexico by purchasers of such goods. Although Plaintiff Ronaldo Guerra refused to admit that his clients conduct such illegal activities, he did concede that there is a probability that the milk is imported into Mexico by means of bribery.

3. The forms in question are Customs Form 7512 entitled "Transportation Entry and Manifest of Goods Subject to Customs Inspection and Permit." Included among these forms were those filed by the Plaintiffs.

4. Article I, § 8, cl. 3 of the United States Constitution provides as follows:

The Congress shall have power . . . to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . . .

amount to discrimination against the Plaintiffs vis-a-vis sellers of nonbonded goods. The Plaintiffs also claim that acts of discrimination are being perpetrated against them in relation to bonded warehouses conducting parallel business on the Canadian border, at international airports and at seaports. The Plaintiffs further allege that the Mutual Assistance Agreement is invalid as violative of the treaty making powers of the United States Constitution [5] in that the Agreement did not receive the advice and consent of two-thirds of the Senate. The Plaintiffs also contend that Defendants' actions constitute a deprivation of property without due process of law. The Plaintiffs further aver that the release of information is contrary to 5 U.S.C. § 552(b)(3) and (4) [The Freedom of Information Act], 19 C.F.R. § 103.10(c) and (d) [The Customs Regulations] and 18 U.S.C. § 1905 [The Trade Secrets Act].

On September 26, 1978, the Defendants filed a Motion to Dismiss, or, in the Alternative, for Summary Judgment. The Defendants contend that the Plaintiffs lack standing in that they have failed to demonstrate the presence of a case or controversy. The Defendants further contend that Plaintiffs' Complaints present a nonjusticiable political question, thus, depriving this Court of jurisdiction. In the alternative, Defendants state that neither The Freedom of Information Act [hereinafter the FOIA] nor The Trade Secrets Act precludes release of the information to the Mexican officials. Additionally, the Defendants state that the Plaintiffs should be denied injunctive relief for the reason that the Plaintiffs are tainted with "unclean hands." Lastly, Defendants claim that the Plaintiffs have not met the four standards necessary to obtain a preliminary injunction.

Based upon the Plaintiffs' Complaints for Temporary Restraining Order, the briefs in support of the Complaints for Temporary Restraining Order, the oral testimony of Ronaldo Guerra, the Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment, and the Defendants' Brief thereto, this Court is of the opinion that the Plaintiffs' request for a temporary injunction be denied and that the Defendants' Motion for Summary Judgment be granted.

■ In a motion seeking injunctive relief, a preliminary injunction is appropriate when the proponent has satisfied four requirements. The plaintiff must prove that 1) there is a substantial likelihood that he will prevail on the merits; 2) a substantial threat exists that he will suffer irreparable injury if the injunction is not granted; 3) the threatened injury to the plaintiff outweighs the threatened harm that the injunction may cause the Defendant; and 4) granting the injunction will not disserve the public interest. *See Hillsboro News Co. v. City of Tampa*, 544 F.2d 860, 861 (5th Cir. 1977). The discussion which follows will be written in light of those requirements.

## I. STANDING

The Plaintiffs contend that the disclosure of the exportation information has resulted in a substantial loss of customers and sales.[6] The Plaintiffs state that their customers have specifically told them that the release of information has intimidating effects upon such customers. These intimidating effects, specifically fears of extortion and harassment,[7] have caused these customers to cease their purchases with the Plaintiffs.

---

**5.** Article II, § 2, cl. 2 of the United States Constitution reads as follows:

The President . . . shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur . . . .

**6.** Specifically, the Plaintiffs contend that following said disclosure, gross sales dropped by several thousand dollars. The Plaintiff Ronaldo Guerra testified that average monthly gross sales had dropped by 60% or approximately

$150,000. The Plaintiffs also contend that the disclosure will make available confidential information resulting in injury to the Plaintiffs' business and harm to their competitive positions.

**7.** Plaintiff Ronaldo Guerra, in his oral testimony at the hearing, was unclear as to who specifically would be the source of this harassment and extortion. Apparently, the Plaintiff was referring to Mexican government officials and Mexican Customs officials.

Because of the cessation of purchases, the Plaintiffs find themselves in the possession of large quantities of powdered milk which they are unable to sell.[8]

The Defendants contend that the Plaintiffs have not stated facts alleging a case or controversy in their representative capacities. The Defendants state that Plaintiffs do not possess the requisite elements of standing to bring an action for injuries suffered by the various Mexican purchasers. The Defendants aver that the Plaintiffs lack standing to sue in their individual capacities, as well. The Defendants specifically challenge the Plaintiffs' standing upon the grounds that the Complaint is nothing more than a generalized grievance common to all United States citizens exporting powdered milk into Mexico, and that the Plaintiffs can show no nexus between the disclosure of the information and the alleged injury sustained. This Court will deal with the two contentions of Defendants separately.

■ In the present case, the pleadings are unclear whether the Plaintiffs actually are suing in a representative capacity. Since the Defendants have raised the claim and the Plaintiffs' pleadings are ambiguous on this point, the Court will discuss whether the Plaintiffs may state claims for the Mexican purchasers in a representative capacity. For a plaintiff to possess standing to sue, he must demonstrate the existence of a case or controversy between himself and the defendant within the meaning of Article III of the Constitution. *See Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In particular, the Plaintiff must allege such a personal stake in the outcome "as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin, supra*, at 498–99, 95 S.Ct. at 2205.

The Court in *Warth* was faced with an attack on a zoning ordinance of the town of Rochester, New York. The Plaintiffs in that case claimed *inter alia*, that the ordinance excluded persons of low and moderate income from living in the town. The Court found that the Plaintiffs lacked standing on this ground because none of them had a present interest in city property, none were subject to the ordinance and none were denied a variance or permit by the city officials.

In so holding, the Court stated that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth, supra*, at 499, 95 S.Ct. at 2205. Further on, the Court stated that "[p]etitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.* at 502, 95 S.Ct. at 2207. *See also Concerned Citizens of Vicksburg v. Sills*, 567 F.2d 646, 649 (5th Cir. 1978).

■ In the present case, the injury suffered, if any, by the Mexican purchasers is separate and distinct from the alleged injury to Plaintiffs. The Plaintiffs have made no claims of harassment or extortion threatened against themselves. The Mexican purchasers are third parties who may have been affected by the government disclosure, but the Plaintiffs in this case can in

---

8. The Defendants suggest that the Plaintiffs lack standing because, in actuality, they are able to sell the powdered milk. Plaintiff Ronaldo Guerra stated during the hearing that due to quotas, the Plaintiffs are unable to enter the powdered milk into the United States market. Further, Plaintiffs are prohibited from returning the merchandise to Canada. Although the Plaintiff did state that it would be possible to ship the goods to another country, he noted that his operation was not geared for such markets. The Defendants assert that there is no injury suffered because of the fact that the Plaintiffs could possibly resell it. This Court, when considering a motion to dismiss for lack of standing, may not delve into such possibilities. When ruling on such a motion, the Court must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Thus, the Court must accept the Plaintiffs' allegations that the powdered milk cannot at this time be sold to non-Mexican markets.

no way claim to be representatives of those purchasers. The legal rights and interests of the Plaintiffs and the purchasers are separate, and as to the Plaintiffs' standing in any representative capacity, this Court considers the decision in *Warth* as dispositive. The Plaintiffs, therefore, have no standing to sue in their representative capacities for the Mexican purchasers, assuming they had desired to do so.

As to the Plaintiffs' standing in their individual capacities, the holding in *Warth* that they must allege a personal stake in the outcome is still required. The very essence of a "case or controversy" is an injury in fact. *See Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 218, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974); *Burleson v. Coastal Recreation, Inc.*, 572 F.2d 509, 513 (5th Cir. 1978). Additionally, the Plaintiffs must show that such injury is likely to be redressed by a favorable decision. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). The injury must be concrete and not abstract. It must be alleged that the plaintiff " 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged statute or official conduct." *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974), *quoting, Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

The Defendants' brief is correct in stating that a generalized grievance common to a large class of citizens is generally not sufficient for a court to maintain its jurisdiction. *See Warth, supra*, 422 U.S. at 499, 95 S.Ct. 2197. Such an injury is normally considered too abstract for a court to assert its remedial powers.

■ However, the mere fact that the alleged harm may affect a large number of citizens does not terminate the court's duty of inquiry.[9] Standing will be extant if the plaintiff alleges distinct and palpable injury to himself "even if it is an injury shared by a large class of other possible litigants." *Warth, supra*, at 501, 95 S.Ct. at 2206. The Plaintiffs in this case concede that the governmental disclosure would affect all bonded warehouses along the Mexican border in the same manner. Nonetheless, this class of bonded warehousemen is rather small, and the Plaintiffs have alleged specific harm to their own businesses and their competitive positions.

The only remaining obstacle to the Plaintiffs' claim of individual standing is that of a sufficient nexus between the disclosure and the alleged injury. The Defendants contend that the Plaintiffs' injuries are caused by the actions of third parties, the Mexican purchasers, and that the Defendants cannot be held responsible for any injury to Plaintiffs caused by those third parties. In conjunction with this argument, the Defendants claim that the relief sought by the Plaintiffs will not be redressed by prohibiting the disclosure.

The Defendants rely heavily on *Warth v. Seldin, supra*, for their argument on this point, and, in fact, claim that the facts in that case are "strikingly similar" to those in the instant case. Because of this, it is necessary to examine two of the claims proposed in *Warth*. The petitioners in *Warth* claimed that city taxes were unnecessarily high because of the exclusionary characteristics of the ordinance. In addition, those petitioners claimed that the ordinance had required them to reside in less attractive environs. The Court in *Warth* found no line of causation between the ordinance and the tax increase. The Supreme Court could discern no affirmative showing that the tax increase had been caused in any way by the ordinance. *See Warth, supra*, at 509–10, 95 S.Ct. 2197. As to the claim that the petitioners had been required to live in more depressed neighborhoods, the Court still refused to find the requisite elements of standing. The petitioners had conceded

---

9. There are certain instances when a class is so large that the injury can be nothing but an abstract one. *See e. g., Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 216–17, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (class of all United States citizens insufficient to create standing).

that their desire to live in Rochester depended on the willingness and efforts of third parties to build low and moderate cost housing. Thus, the Court concluded that the plaintiffs' injuries, if any, were due to this lack of willingness to build by such third parties, a predicament which was not predicated upon any city ordinance.

The Defendants in this case contend that the Mexican purchasers are akin to the third party home builders and contractors in *Warth*. The Defendants argue that the injuries to the Plaintiffs were caused by such third parties and not by the Mutual Assistance Agreement.

However, the Court in *Warth* did not preclude all indirect injuries arising from action or nonaction by third parties. Particularly, the Supreme Court stated that

[t]he fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing. When a governmental prohibition or restriction imposed on one party causes specific harm to a third party, harm that a constitutional provision or statute was intended to prevent, the indirectness of the injury does not necessarily deprive the person harmed of standing to vindicate his rights.

*Warth, supra,* at 504–05, 95 S.Ct. at 2208.

In such a situation, the Court concluded that, although it might be substantially more difficult, the plaintiff must still meet the minimum requirements of Article III, i. e., the asserted injury was the consequence of the defendant's actions or that prospective relief will remove the harm. *See Warth, supra,* at 505, 95 S.Ct. 2197.

A more recent Supreme Court case, *Simon v. Eastern Kentucky Welfare Rights Organization, supra,* dealt with a similar issue. The petitioners in that case claimed

that the allowance by the Internal Revenue Service of a favorable tax treatment to nonprofit hospitals which did not provide completely free services to indigents "encouraged" the hospitals to continue their denials of such services. The Court found no showing that the hospitals' practices toward indigents were a result of the revenue ruling in question. The Court also concluded that it was purely speculative whether the granting of the relief would result in the availability of such services to respondents. *See Simon, supra,* 426 U.S. at 42–43, 96 S.Ct. 1917.

The facts in the instant case do not beg of such tenuous relationships as found in *Warth* and *Simon*. In the present case, there can be no doubt that the drop in sales due to the cessation of purchases by third parties was a direct result of the disclosure of information conducted by the United States Customs Service. There are no loose allegations of causation as were present in *Warth* and *Simon*. The causation is clear and obvious. The Plaintiffs, therefore, satisfy the first requirement of standing: the injury can be traced to the challenged action of the Defendants.

■ The facts of this case regarding the sudden drop in sales and continuation of low sales immediately subsequent to the disclosure of information indicate that a prohibition on disclosure would lead to a resumption of purchases at the level prior to the time of disclosure.[10] In this case, unlike in *Warth* and *Simon,* there can realistically be no other reason for the alleged injury to the Plaintiffs outside of the actions taken by the Customs Service.

This Court is unable to agree with the Defendants that the facts in *Warth* are "strikingly similar" or that the outcome in this case should be the same.[11] The Plain-

---

**10.** This line of reasoning is buttressed by the fact that Ronaldo Guerra, in his oral testimony, stated that he had been told by such purchasers that they would cease to purchase other items such as tobacco and alcohol if information was disclosed as to those items. The Court does not use these statements in its inquiry as to standing *per se* because such threatened harm would probably not arise to the

level of a case or controversy. But it is useful in a factual determination of causation and in determining whether an injunction would redress the injury.

**11.** This is not to impugn the brief of the Defendants. In point of fact, the brief presented by the United States Attorney on behalf of the Defendants is well researched and well written.

tiffs have alleged an injury in fact which can be traced directly to the actions of the Defendants. Further, it is apparent that granting the relief would in all likelihood redress the injury.

## II. VALIDITY OF THE MUTUAL ASSISTANCE AGREEMENT

The Plaintiffs allege that the Agreement is not binding because it was not signed by the President and, thus, the signing of the Agreement was an unauthorized act by Customs. The Plaintiffs further allege that the agreement is invalid because it is not a treaty ratified by the United States Senate. The Plaintiffs finally allege that the Agreement should be preempted since it infringes upon Congress' power to control the field of foreign commerce. The Defendants counter that the relief sought in this case, the abrogation of the Mutual Assistance Agreement, would impair the relationship between the United States and Mexico and would erode the power of the Executive Branch in its relations with foreign governments. The Defendants claim that such facts give rise to a nonjusticiable political question.

■ This Court sees little merit in Plaintiffs' first contention since the parties have stipulated that the Mutual Assistance Agreement is an executive agreement. That being the case, the parties have conceded that it was signed and effected through the Executive Branch. The Plaintiffs' second contention also requires little discussion. It has been long recognized that the President has the power to enter into international agreements without the need of acquiring the Senate's permission. *See United States v. Belmont,* 301 U.S. 324, 330–31, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); *Neal-Cooper Grain Co. v. Kissinger,* 385 F.Supp. 769, 773–74 (D.C.D.C.1974). Although the making of executive agreements is not expressly granted by the Constitution, the power over foreign relations is

accorded to the President. The right to enter into executive agreements with foreign nations derives from that power. Such wide ranging power is occasionally disallowed in such agreements dealing with domestic affairs. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Executive Order directing the seizure of steel mills). In the field of foreign relations, however, the Supreme Court has recognized that in order to maintain our international relations and to avoid embarrassment, Congress must often acquiesce to the actions of the President which would not be admissible if domestic affairs alone were involved. *See United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 320, 57 S.Ct. 216, 81 L.Ed. 255 (1936). In addition, courts have noted the near impossibility of requiring Congress to pass on every executive agreement entered into with a foreign government. *See Dole v. Carter,* 444 F.Supp. 1065, 1070 (D.Kan. 1977).

In the instant case, the Executive Branch apparently saw a need to enter into the Mutual Assistance Agreement. The Executive Branch possesses such a power, and it is the opinion of this Court that the Agreement need not be ratified by the Senate to be valid.

■ The Plaintiffs' third contention, that of congressional preemption, is misplaced. There is no doubt that Congress has the power to regulate foreign commerce under article I, § 8, clause 3. *See United States v. 12 200-Ft. Reels of Super 8mm. Film,* 413 U.S. 123, 125, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); *Consumers Union of U.S., Inc. v. Kissinger,* 165 U.S.App.D.C. 75, 81–82, 506 F.2d 136, 142–43 (1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2406, 44 L.Ed.2d 673 (1975). The Court believes, however, that the execution of the Mutual Assistance Agreement was not an effort by the Executive Branch to regulate foreign commerce. The purpose of the Agreement is to ensure

The Court regrets that it cannot speak so favorably of Plaintiff Victor Guerra's "brief." In order to avoid any further tenders of disjointed, disordered and distressing briefs, attorneys for

the Plaintiff in Civil Action B–78–215 would be advised to review the form and techniques of brief writing.

obeyance of Customs laws and to prevent export illegalities at border crossings.[12] The Court has already discussed the power of the Executive Branch to take action which it feels is required for the maintenance and advancement of our foreign relations. Since this Court finds no intrusion upon Congress' power to regulate commerce, there is no reason to apply the congressional preemption theory.

## III. POLITICAL QUESTION

[8, 9] A more difficult question is posed by the Defendants' raising of the political question issue. A case before a federal court involving a political question presents a nonjusticiable issue. The origin of the political question is found in the constitutional separation of powers among the three branches of government. *See Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *Occidental of UMM al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard the Tanker Dauntless Colocotronis,* 577 F.2d 1196, 1203 (5th Cir. 1978). There are instances where the resolution of an issue revolves about standards that are incapable of judicial application or where the exercise of discretion is patently entrusted to the Executive or Legislative Branches. Such discretion is beyond the competence of the courts to decide.[13] *See Baker v. Carr, supra,* 369 U.S. at 211, 82 S.Ct. 691.

▮▮▮ When a court is forced to delve into foreign policy considerations which have already been considered by the Executive Branch with information both unobtainable to the courts and confidential, it must defer to the President's judgment. *See, e. g., Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 114, 68 S.Ct. 431, 92 L.Ed. 568 (1948) (Presidential approval of overseas air transportation certificate of convenience); *Occidental of UMM al Qaywayn, Inc., supra,* (Tortious conversion of oil suit involving a resolution of territorial disputes between sovereigns); *Dole v. Carter,* 569 F.2d 1109, 1110 (10th Cir. 1977), (Executive decision to return the Crown of St. Steven to the people of Hungary).

The Defendants in the present case argue that because of the presence of the executive agreement, this Court will be forced to trespass into a realm where it has no orientation or understanding. The Supreme Court, however, has said that "[t]he doctrine of which we treat is one of 'political questions,' not one of 'political cases.'" *Baker v. Carr, supra,* 369 U.S. at 217, 82 S.Ct. at 710. The Court in *Baker* made it clear that not every case which touches foreign relations is beyond judicial capability. Rather, the Court stressed the "necessity for discriminating inquiry into the precise facts and posture of the particular case, and the impossibility of resolution by any semantic cataloguing." *Id.*

▮▮▮ The facts in the instant case involve an agreement which has already been determined to be a valid alternative to a treaty. If this Court was forced to interpret or refute the contents of the Agreement, it would have no choice but to find

---

12. It is difficult to perceive how the Mutual Assistance Agreement could have an effect on foreign commerce. The Agreement merely allows disclosure of exportation information which should not hinder any legal and proper commerce. There might be an effect on commerce in regard to those who export goods illegally and who would rather not have the Mexican government aware of it. The Court assumes and hopes that the Plaintiffs are not asserting such a claim, for, if so, it would be a specious one.

13. The Court in *Baker v. Carr, supra,* set forth several situations which would demand the finding of a political question. They included 1) a textually demonstrable constitutional commitment of an issue to a coordinate political department; 2) a lack of judicially discoverable and manageable standards for resolving the issue; 3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; 4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; 5) an unusual need for unquestioning adherence to a political decision already made; or 6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question. *Baker v. Carr, supra,* 369 U.S. at 217, 82 S.Ct. 691.

this case nonjusticiable. The language of the Agreement, however, allows this Court to accept the Executive Agreement as binding without any need to interpret or dissect it. The Agreement provides that all actions taken, including the execution of requests for information, shall be performed in accordance with the laws of the respective countries.[14] Such wording cannot logically give rise to any claim of illegality or conflict with the laws or Constitution of this country.[15]

Thus, this Court is of the opinion that the Executive Agreement itself is valid, and since the Agreement directs this Court to the laws of this country, there is no need to inquire into any foreign policy considerations. The Court may continue its investigation into Plaintiffs' allegations since the case does not involve a political question and is, therefore, justiciable.

## IV. STATUTORY AUTHORIZATION FOR DISCLOSURE

[13] The Plaintiffs contend that the release of the information is contrary to 18 U.S.C. § 1905, 5 U.S.C. § 552(b)(3) and (4) and 19 C.F.R. § 103.10(c) and (d). Apparently, Plaintiffs contend that the criminal sanctions of 18 U.S.C. § 1905 act as a bar to the disclosure of information. Section 1905 makes it a federal offense for an officer or employee of the United States or of any department or agency thereof to publish, divulge, disclose or make known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties. Obviously, if § 1905 does apply, then any decision to disclose by Customs would be void as an abuse of discretion. Although one Circuit has held that § 1905 does act as a bar to disclosure [16] pursuant to 5 U.S.C. § 552(b)(3),[17] this Court is of the opinion

**14.** Article 2, § 4 of the Mutual Assistance Agreement reads as follows:
> All actions under the present Agreement by either Party will be performed in accordance with its laws.

Article 7, § 1 of the Agreement further provides:
> The law of the requested Party shall be applicable in the execution of requests; the requested Customs Service shall be required to seek any official or judicial measure necessary to carry out the request.

**15.** It is difficult to determine whether this Court would have the power to question the illegality or constitutionality of such an agreement. As has been shown, great deference is given to decisions of the executive branch in foreign relations, and courts are reluctant to strike down such agreements unless they are in direct conflict with the constitutional power of another branch. *See United States v. Guy W. Capps, Inc.*, 204 F.2d 655 (4th Cir. 1953), *aff'd on other grounds*, 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329 (1955) (executive agreement concerning grants of exportation permits between United States and Canada held to infringe on Congress' power to regulate commerce). Even in the *Capps* case, the Supreme Court on review refused to rule on the actual validity of the agreement, instead affirming on the sole basis that the evidence had been insufficient to prove the underlying breach of contract claim. There is *dicta* in an early Supreme Court case which would seem to allow such inquiry. In *United States v. Belmont, supra,* the Court found a political question because the only party harmed was a Soviet corporation which had

been nationalized following the October, 1917 revolution in Russia. The Court did state that if the constitutional rights of United States nationals had been affected by the action of the Soviet government, they might be entitled to judicial relief. 301 U.S. at 332–33, 57 S.Ct. 758. Fortunately, the language of the Mutual Assistance Agreement has spared this Court the necessity to inquire into any constitutional claim made by Plaintiffs in relation to the Agreement.

**16.** The Fourth Circuit Court of Appeals, in *Westinghouse Electric Corp. v. Schlesinger*, 542 F.2d 1190 (4th Cir. 1976), *cert. denied sub nom., Brown v. Westinghouse Electric Corp.*, 431 U.S. 924, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977), has held that § 1905 is incorporated in § 552(b)(3), and thus bars disclosure. Section 552(b)(3) specifically prohibits disclosure of any information exempted by statute. The Fourth Circuit has determined that § 1905 qualifies as a "statute" under Subsection (b)(3). A decision by the Seventh Court of Appeals on precisely this issue is presently awaiting argument before the Supreme Court. *See Sears, Roebuck & Co. v. Dahm*, No. 78–97 (7th Cir., filed July 17, 1978).

**17.** 5 U.S.C. § 552(b)(3) reads as follows:
> (b) This section does not apply to matters that are—
> \* \* \* \* \* \*
> (3) specifically exempted from disclosure by statute (other than § 552(b) of this title), provided that such statute (A) requires that the matters be withheld from the public in

that § 1905 does not serve as a bar to disclosure of information. In *Chrysler Corp. v. Schlesinger*, 565 F.2d 1172 (3d Cir. 1977), *cert. granted sub nom., Chrysler Corp. v. Brown*, 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978), the Third Circuit Court of Appeals held that the nondisclosure prohibition of § 1905 applies only to disclosures "not authorized by law." The Court held that the disclosure of information pursuant to a validly enacted agency regulation is an action authorized by law. In that case, the Court noted that 5 U.S.C. § 301 [18] does authorize such disclosure. The Court believed that the last sentence of § 301 demonstrated a policy of full disclosure. The circuit judges believed that reading § 1905 as a bar would ignore the central purpose of § 301 and "would transmogrify § 1905 into a weapon for those parties who advocate government secrecy." *Chrysler Corp., supra,* at 1187. It also appears to this Court that even in the absence of § 301, § 1905 is not specific enough to come within the exemption in § 552(b)(3). *See Neal-Cooper Grain Co., supra,* at 776.

The Plaintiffs also contend that the FOIA prohibits disclosures which involve commercial or financial information as delineated in 5 U.S.C. § 552(b)(4).[19] To decide this issue, a short discussion of the purpose of the FOIA is required. The basic purpose of the FOIA is to promote and effectuate full disclosure of information. *See Charles River Park "A", Inc. v. Department of Housing & Urban Development,* 171 U.S. App.D.C. 286, 292, 519 F.2d 935, 941 (1975). Any contrary interpretation would be a blatant subversion of that purpose.

As a corollary to this purpose of the FOIA, it would be anomalous to believe that the FOIA could serve as a blanket prohibition of disclosure. Section 552 requires that each agency shall make available to the public [20] all information except for nine exceptions in which the mandate of disclosure does not apply. These include subsections (b)(3), which has already been discussed, and (b)(4) which is now under discussion. Even though these exceptions disallow mandatory disclosure, it would be illogical, in light of the purpose of the FOIA, to hold that such exceptions act as an absolute shield to any disclosure. *See Department of the Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976); *Environmental Protection Agency v. Mink,* 410 U.S. 73, 79, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). In *Pennzoil Co. v. Federal Power Commission,* 534 F.2d 627 (5th Cir. 1976), the Fifth Circuit held that merely because the information in that case was encompassed within subsection (b)(4), its disclosure was not forbidden. In such situations, the court ruled that the information could still be released unless the act of the agency amounted to an abuse of discretion. *Id.* at 631. In other words, most information in possession of a government agency must be released. That information which is included within the exemptions need not be released unless the agency finds that disclosure would serve a legitimate legislative function. The Act itself does not contain any language of mandatory prohibition. The Act simply states that its normal

---

such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

**18.** 5 U.S.C. § 301 reads as follows:

The head of an Executive department or military department may prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property. This section does not authorize withholding information from the public or limiting the availability of records to the public.

**19.** 5 U.S.C. § 552(b)(4) reads as follows:

(b) This section does not apply to matters that are—

\* \* \* \* \* \*

(4) trade secrets and commercial or financial information obtained from a person and privileged or confidential.

**20.** In referring to the public, there is no doubt that foreign governments are considered persons as defined in 5 U.S.C. § 551 and thus have a right to request information under the FOIA. *See Stone v. Export-Import Bank of United States,* 552 F.2d 132, 137 (5th Cir. 1977), *cert. denied,* 434 U.S. 1012, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978); *Neal-Cooper Grain Co., supra,* at 776.

requirement of disclosure "does not apply" to the nine exemptions.[21] The court in *Pennzoil* held that determining whether the matter within subsection (b)(4) should be released requires a balancing of the public and private interests involved. *Id.*

As a further aid in deciding whether to release such discretionary information the courts have defined the word "confidential" as found in that subsection. A matter is confidential if the release of the information is likely 1) to impair the government's ability to obtain necessary information in the future; or 2) to cause substantial harm to the competitive position of the person from whom the information was obtained. *See Charles River Park, supra,* 171 U.S.App. D.C. at 291, 519 F.2d at 940.

The District of Columbia Circuit Court of Appeals in *Neal-Cooper, supra,* has dealt with a similar situation involving disclosure by the Customs Service of certain information to the Mexican government. In that case the court discussed the term "confidential" as defined above, and refused to find that the information was of such a confidential nature as to prohibit disclosure. In the present case, the information which is disclosed includes the type of goods being exported, the quantity and value of such goods and the sources and destination of the goods. The Plaintiffs are required by law to file such information. Since it is a statutory requirement, public disclosure cannot impair the ability of the government to obtain such information in the future. Under these sets of facts, the Plaintiffs do not satisfy the first definition of "confidential." *See National Parks and Conservation Association v. Morton,* 162 U.S.App.D.C.

223, 228, 498 F.2d 765, 770 (1974). As to the second alternative, competitive harm, the Court finds it difficult to discern any competitive harm. Plaintiff Ronaldo Guerra, by his own admission, can export only to Mexico. Therefore, Plaintiffs' only competition involves other bonded warehouses who export powdered milk to Mexico. Further, the same Plaintiffs have testified that the disclosure will have an equal effect on all powdered milk exporters to Mexico. This is further strengthened by the fact that the Mexican government will keep such information confidential.[22] If so, competitors of Plaintiffs will have no ability to discover the contents of the disclosed information. Assuming such facts are true, the Court can foresee no competitive harm to the Plaintiffs.

As to the balancing of interests necessary in the determination of disclosure, the government's purpose in this case in disclosing the information is to ensure legal and proper exportation of powdered milk into Mexico. The Court assumes that the Customs Service had valid reasons behind its decision to disclose information on such exportation. The private interests involved are in reality *de minimus.* The information disclosed to the Mexican officials must be kept in confidence as required by the Agreement. Further, there has been no indication that the Mexican government intends to release such information. It seems apparent that any individual conducting legal business could not be harmed by the disclosure. In balancing similar considerations, the court in *Neal-Cooper, supra,* held that loss of customers and a "poor climate" for business were outweighed by the loss

---

21. For a well-reasoned article on the legislative history of the FOIA which, *inter alia,* concludes that matter within the exemptions is not absolutely barred from disclosure, see Clement, *The Rights of Submitters to Prevent Agency Disclosure of Confidential Business Information: The Reverse Freedom of Information Act Lawsuit,* 55 Tex.L.Rev. 587 (1977).

22. Article 3 of the Mutual Assistance Agreement provides:

1) Inquiries, information, documents and other communications received by either Par-

ty shall, upon request of the supplying Party, be treated as confidential. The reasons for such a request shall be stated.

2) Information, documents and other communications received in the course of mutual assistance may only be used for the purposes specified in the present Agreement, including use in judicial or administrative proceedings. Such information, documents and other communications may be used for other purposes only when the supplying Party has given its express consent.

the United States would suffer in its relations with Mexico and in disruption of the flow of information. *See Neal-Cooper, supra*, at 779. This Court is of the opinion that, in balancing the public and private interests, there is a legitimate legislative function in disclosure and further that there would be little, if any, harm to private interests.

■ Lastly, the Plaintiffs contend that disclosure is prohibited by the Customs Regulations.[23] Section 103 is merely an implementation of the FOIA and details the procedure by which information may be obtained. These Regulations list a number of documents which the Customs Service may lawfully withhold. The Customs Regulations, however, provide in § 103.0 that the Service may make available records which it is authorized to withhold whenever it determines that disclosure is in the public interest.

In view of this, this Court believes that its earlier discussions on confidentiality and the public interest issues resolve the Plaintiffs' allegations concerning the Customs Regulations. The Court believes that the Customs Service has the discretion and right to release such information under the Customs Regulations.

## V. CONSTITUTIONAL CLAIMS OF THE PLAINTIFFS

Plaintiffs claim that the actions of the Customs Service in the instant case have deprived the Plaintiffs of their property, the right to engage in a lawful business, and their rights to sell goods and make contracts, all without due process of law. Plaintiffs also contend that the disclosures amount to discrimination against Plaintiffs in relation to other bonded warehouses in Canada, at international airports and at seaports, and in relation to those who do not sell bonded merchandise into Mexico.

■ To generate a due process claim, a party must demonstrate that it holds an interest arising out of a law or understanding with the state that transcends an abstract need or desire or a unilateral expectation and qualifies as a legitimate claim of entitlement. *See Wells Fargo Armored Service Corp. v. Georgia Public Service Commission*, 547 F.2d 938, 940 (5th Cir. 1977). This Court is unable to discern a legitimate claim of deprivation of due process under these circumstances. Loss of customers does not rise to the level of a property right guaranteed by the Constitution. Further, the disclosures in this case should have absolutely no effect on individuals or organizations engaging in lawful business. This Court need not rule on whether any of the claimed deprivations rise to the level of a property interest since the effect of the disclosures should not disturb and, in fact, should be welcomed by all those conducting legal exporting operations. The only practical deprivation that might occur is the inability to conduct unlawful business, and obviously such a right is not guaranteed by the Constitution. This Court is of the opinion that the due process claims made by Plaintiffs are without merit.

■ Although the Equal Protection Clause of the Fourteenth Amendment is inapplicable against the United States, and the Fifth Amendment possesses no equivalent clause, the Fifth Amendment does prohibit discrimination that is so unjust as to violate due process. *See Ducharme v. Merrill-National Laboratories*, 574 F.2d 1307, 1310 (5th Cir. 1978). If the Plaintiffs could allege that fundamental rights are at stake,

---

**23.** 19 C.F.R. § 103.10(c) and (d) read as follows:
United States Customs Service opinions, orders, rulings, statements of policy, interpretations, and records generally may be inspected, copied, or otherwise obtained unless they relate to the following:

* * * * * *

(c) *Matters exempted from disclosure by statute.* Information specifically exempted from disclosure by statute. This includes information pertaining to trade secrets, business operations, and commercial or financial information of importers, exporters, and other persons who transact Customs business (18 U.S.C. § 1905).

(d) *Privileged or confidential information.* Trade secrets and commercial or financial information obtained from any person which is privileged or confidential . . .

or if Plaintiffs could be considered a suspect class, this Court would be required to apply the "strict scrutiny" test. The strict scrutiny test requires that the government show that the legislative classification is necessary to a compelling governmental interest. *See Mason v. Lister,* 562 F.2d 343, 346 (5th Cir. 1977). Loss of customers and fears of extortion and harassment to those customers do not amount to deprivations of fundamental rights. In addition, bonded warehousemen cannot be considered a suspect class.

 Therefore, this Court, in considering a claim of violation of equal protection, need only apply the "minimum rationality" test. Under this test the particular classification "need only be rationally related to that objective, and free from arbitrariness and invidious discrimination." *Hennessey v. National Collegiate Athletic Association,* 564 F.2d 1136, 1145 (5th Cir. 1977). The Customs Service objective, as mentioned before, is to ensure that powdered milk is exported into Mexico in an honest and legal manner. The objective itself is a logical one since the evidence shows, and Plaintiff Guerra concedes, that a high degree of bribery occurs in the exportation of powdered milk from the United States into Mexico. The disclosure of exportation information to Mexican Customs officials is a rationally related method of accomplishing that objective. The Court is unable to perceive any signs of arbitrariness or invidiousness. Having determined that the disclosure satisfies the minimum rationality test, this Court must reject the equal protection claim of the Plaintiffs.

## VI. CONCLUSION

 This Court believes that the conclusions of law made above are sufficient to decide this dispute and finds it unnecessary to discuss the Defendants' claim of unclean hands. Based upon the above discussion, this Court is of the opinion that the Plaintiffs do not have a substantial likelihood that they will prevail on the merits. Nor does the Court believe that the threatened harm to Plaintiffs, the loss of business, outweighs the threatened harm to Defendants which would include an erosion of amicable relations with Mexico and a disruption of the free flow of information. Lastly, the Court does not believe that an injunction would serve the public interest.

Defendants have also moved for dismissal, or, in the alternative, for summary judgment. On a motion for summary judgment pursuant to Fed.R.Civ.P. 56, the Court's main concern is to determine whether a genuine issue of material fact exists. *See Munoz v. International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada,* 563 F.2d 205, 207 n.1 (5th Cir. 1977). The Court is unable to discover any dispute as to a material fact. After examining the pleadings, including the Defendants' Motion for Summary Judgment and the affidavit attached thereto, the stipulations of the parties and the oral testimony, the Court finds that there is no dispute as to any material fact in this case. The only arguments presented by each side concern questions of law. The Court has determined such questions of law and believes that summary judgment for the Defendants is appropriate.

Based upon the above, it is hereby

ORDERED that the Plaintiffs' Motion for a Preliminary Injunction be, and the same is hereby, DENIED.

It is further ORDERED that the Temporary Restraining Order that is now in effect be, and the same is hereby, dissolved.

It is further ORDERED that the Defendants' Motion for Summary Judgment be, and the same is hereby, GRANTED.